1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF NEW YORK

3

4    ROBERT F. and APRIL F.,                )
                                            )
5                                           )
              Plaintiffs,                   )    CASE NO. 18-CV-594
6                                           )
       vs.                                  )
7                                           )
     NORTH SYRACUSE CENTRAL SCHOOL          )
8    DISTRICT, et al.,                      )
                                            )
9                 Defendants.               )
     _____)

10                   **TRANSCRIPT OF PROCEEDINGS**
11              **BEFORE THE HON. LAWRENCE E. KAHN**
                    **THURSDAY, JULY 11, 2019**
12                    **ALBANY, NEW YORK**

13
     **FOR THE PLAINTIFFS:**
14      COOPER ERVING & SAVAGE LLP
        By:  CARLO ALEXANDRE C. DE OLIVEIRA, ESQ.
15      39 North Pearl Street, 4th Floor
        Albany, New York 12207
16
     **FOR THE DEFENDANTS:**
17      BOND SCHOENECK & KING, PLLC
        By:  KATE I. REID, ESQ.
18      One Lincoln Center
        Syracuse, New York 13202
19

20

21

22

23

24

25

                    *JACQUELINE STROFFOLINO, RPR*
                 *UNITED STATES DISTRICT COURT - NDNY*

**18-CV-594**

1            (Open court, 11:30 a.m.)

2            THE CLERK:  Thursday, July 11, 2019.  The case is

3    Robert F. and April F. versus North Syracuse Central School

4    District, North Syracuse Board of Education, Annette Speach, and

5    Dawn Hussein.  Thank you.  May we have appearances for the

6    record.

7            MR. DE OLIVEIRA:  Good morning, Judge.  Carlo de

8    Oliveira, Cooper Erving & Savage for the plaintiffs.

9            THE COURT:  Mr. de Oliveira.

10           MR. DE OLIVEIRA:  I also have, Your Honor, my client,

11   Robert F.

12           MS. REID:  Good morning, Judge.  Kate Reid, Bond,

13   Schoeneck & King for the defendant North Syracuse Central School

14   District.

15           THE COURT:  Ms. Reid.  Okay.  I'm along with my clerks

16   looking over the many issues here.  Some of them are still a bit

17   confusing, but everyone wants to take care of the child

18   involved.  And I have before me an order to show cause for a

19   preliminary injunction is what you're seeking.

20           I'll obviously have you speak first and then any

21   response from the school district, and specifically you can let

22   us know what specifically you're asking the Court to order or

23   give the plaintiff in a preliminary injunction, but go ahead.

24   Let me hear your arguments.

25           MR. DE OLIVEIRA:  Good morning, Your Honor.  Thank

**18-CV-594**

1    you.  I hope we're able to clarify any questions that the Court

2    still may have.

3              THE COURT:  May have a few.

4              MR. DE OLIVEIRA:  We are here before Your Honor

5    seeking preliminary injunction to enforce the mandate in a

6    decision of the IHO which was issued back in January 2018.

7              THE COURT:  Is that still in effect?

8              MR. DE OLIVEIRA:  It's still in effect, Your Honor.

9    And the reason why it's still in effect --

10             THE COURT:  It does not expire ever?

11             MR. DE OLIVEIRA:  It doesn't expire because of the

12   nature of the services found to be necessary for this child's

13   education, and I think I put in our brief an analogy.  What the

14   school district is arguing is in essence that a student with

15   disability who needs certain services to be able to function in

16   a school district, those services are limited per grade.  So if

17   I have to build a ramp in a school district for a child who

18   needs a ramp because the child is in a wheelchair, that

19   accommodation will end as soon as the child moves on to

20   kindergarten.  That's absolutely untrue, and I think --

21             THE COURT:  I'll hear what you have to say.

22             MR. DE OLIVEIRA:  Right.  And I think that the IHO's

23   decision speaks to that fact because the IHO response to that

24   same argument which was apparently raised during the hearing in

25   his decision, and the IHO said that there are certain issues.

**18-CV-594**

1   There are certain violations committed by the school district.

2   They are prone to be repeated again, and because this child

3   needs services in order to function in the school district, you

4   can't just limit those services to preschool.

5          The decision has no time limitation.  The decision

6   actually provides remedial measures to address the violations

7   that occurred prior to the decision, but he also provides

8   prospective remedies, which is what we're asking the Court to

9   enforce.  Some of those remedies are that this child, because of

10  the nature of his disability, he needs certain services.  And

11  the services that the IHO found are necessary for this child's

12  development is ABA therapy services.

13         THE COURT:  In the IHO, does it require how many

14  hours?  I think you were asking for 40 hours of training for ABA

15  training and the school district says 20 is sufficient, and I

16  couldn't see if the IHO order specifies.

17         MR. DE OLIVEIRA:  The IHO order, if I recall, Your

18  Honor, the IHO order does not specify how many hours of direct

19  ABA therapy is necessary, but I think one distinction that needs

20  to be made, and I think that's what is confusing about this

21  case, and I recognize that the school district is either raising

22  this issue due to the lack of misunderstanding of the services

23  or either, you know, they're doing that intentionally.

24         But ABA services are services that are required for

25  children, autistic children, and it involves treatment that is

*JACQUELINE STROFFOLINO, RPR*
*UNITED STATES DISTRICT COURT - NDNY*

**18-CV-594**

1    designed to help the child get rid of any bad and harmful

2    behavior to his learning, but also teach that child how to learn

3    in a school setting.  The ABA services are divided into two

4    components.  There is an intensive component which requires the

5    child to be pulled out of class and work one on one with a

6    therapist, and that is very important because that's where the

7    building block for this child's learning is.  It's the

8    foundation for the child's learning.  In that one on one, the

9    direct contact with the therapist, the therapist will work with

10   this child one on one to develop his or her independence.  So

11   that is an essential element of ABA therapy.

12          In addition to that, once that child learns those

13   behaviors in a one-on-one setting, the child is then brought

14   into what is called the natural setting, which is the classroom.

15   So when the child is in the natural setting, the classroom,

16   there is also techniques utilized with this child in a classroom

17   so the child can respond to the environment and the teachers and

18   the peers.

19          What the school district is refusing to provide this

20   child in the case is the building block for this child's

21   success, which is the direct ABA therapy.  This child has not

22   been provided direct ABA therapy as mandated by the IHO since --

23   well, ever.  What the school district allowed the child to

24   receive was direct ABA therapy two days a week for an hour and

25   15 minutes.  The IHO said that this child needed at least 45

**18-CV-594**

1    minutes of direct ABA therapy a day.  So one hour, 15 minutes

2    for two days of direct ABA therapy, but that only lasted for a

3    few months because in October 2018, and we have all the

4    affidavits provided by the professionals in charge of providing

5    those services show that the school district told them that they

6    did not want this child to be pulled out of class anymore for

7    these services.

8           So in essence, the school district is telling the

9    parents, "We're not going to allow your child to build the

10   building block that is necessary for his learning."  And the

11   reasons are set forth in my client's affidavit.  The reasons

12   range from the union is against having another professional in a

13   classroom.  We just can't contract with a BCA, which is a typo

14   in the IHO decision.  So the rationale given by the school

15   district not to provide those services has no basis in law or

16   the fact.

17          THE COURT:  Am I correct that the IHO requires ABA

18   therapy to be given by someone with a BCBA or LBA certification

19   and Amanda only has an RBT, the one who's doing it?

20          MR. DE OLIVEIRA:  That is correct, Your Honor.

21          THE COURT:  Do you object to that?

22          MR. DE OLIVEIRA:  My client is here.  Yes.  No.  We

23   don't object to the provision of direct ABA services by Amanda

24   Wise, which is the RBT.

25          THE COURT:  That's okay with you?

**18-CV-594**

1          MR. DE OLIVEIRA:  That is okay with the parents.

2          THE COURT:  Do you agree that Amanda Wise has

3  performed the ABA therapy that's required by the IHO or the IEP?

4          MR. DE OLIVEIRA:  Say that again, Your Honor.

5          THE COURT:  Do you agree to have Amanda Wise perform

6  the ABA therapy required by the IEP or the IHO?  You agree with

7  that?

8          MR. DE OLIVEIRA:  My clients would agree.

9          THE COURT:  To have Amanda Wise perform it.

10          MR. DE OLIVEIRA:  To have Amanda Wise perform both,

11  and that's the important distinction.  The natural environment

12  ABA therapy, but also the most important portion of our request

13  today, Your Honor, is that the school be ordered to allow direct

14  ABA therapy.  And to the extent that the Court is willing to

15  order the school to provide those services as mandated by the

16  IHO, my clients would not object if those services are provided

17  by Amanda Wise.

18          THE COURT:  You want in-class ABA therapy?

19          MR. DE OLIVEIRA:  In-class ABA therapy is different

20  than direct ABA therapy.  Amanda Wise is currently in the

21  classroom utilizing techniques of ABA therapy, but as I

22  explained earlier, those are reinforcement techniques after the

23  child learns the foundation in a direct setting.

24          THE COURT:  So you object to her doing that?

25          MR. DE OLIVEIRA:  No.  We do not object to her

**18-CV-594**

1    continuing to do ABA therapy in the classroom.  What we're

2    asking the district to do is allow Amanda Wise to pull this

3    child out of the classroom as well to provide direct ABA

4    therapy.

5             THE COURT:  And they're not allowing that direct

6    therapy?

7             MR. DE OLIVEIRA:  They have not allowed Amanda Wise to

8    do so.  She has testified both in her affidavit and at a

9    deposition that those services have not been provided.  We have

10   affidavits from the previous LBA who initiated the services back

11   in the fall of 2018 in which she says, "I was allowed to do

12   direct ABA therapy for a few months, and then the school

13   district asked us to pull out, did not allow myself to continue

14   to do the direct ABA therapy."  And without direct ABA therapy,

15   this child's learning would not materialize because we're not

16   building the foundations for the learning.

17            THE COURT:  Okay.  Are you requesting Amanda Wise to

18   perform pull-out ABA therapy?

19            MR. DE OLIVEIRA:  We are requesting that the district

20   allows this child to be pulled out of classroom to receive

21   direct ABA therapy by any professional capable.  To the extent

22   Amanda Wise is still available to provide those services, we

23   don't have an objection to it.  So long as direct ABA therapy is

24   provided, we are okay with that.

25            THE COURT:  Is there ABA training required for the

**18-CV-594**

1    parents?

2            MR. DE OLIVEIRA:  That is another issue that we raise

3    in our preliminary injunction, that the IHO clearly stated that

4    the school district was required to provide ABA training for the

5    parents.  And the reason for that is that once the child learns

6    those foundation skills in a direct ABA setting, both in school

7    and at home, there has to be continuity.  There has to be a way

8    for the parents to interact with this child in a way that does

9    not cause regression.

10           THE COURT:  Are you saying that the defendant school

11   district is not allowing that?

12           MR. DE OLIVEIRA:  The defendant school district has

13   not provided the services.

14           THE COURT:  And you did request them?

15           MR. DE OLIVEIRA:  We have requested.  IHO ordered

16   that.  The parents have requested, and the school district has

17   yet to provide them.  They provided for two months out of the 14

18   months since the IHO decision.

19           THE COURT:  Speaking about the IHO, does that expire

20   anytime?  How long does that apply?

21           MR. DE OLIVEIRA:  Our position, Your Honor, is that

22   that will continue throughout this child's academic career.

23           THE COURT:  It could be 10, 15 years?  Does it ever

24   have to be renewed, which might be a pain in the neck to do

25   every year, but how does it work?  What's the requirement?

**18-CV-594**

1          MR. DE OLIVEIRA:  I think that would be an answer for

2     the professionals working with the child.  If you look, the

3     record of this child right now is that the child has shown

4     regression because of the lack of treatment.  To the extent that

5     this child can reach a limit, a threshold that would allow this

6     child to function in class, then I believe that that would be

7     the end of the services.  But until we reach that point, I think

8     the IHO decision is pretty clear.  This child needs the services

9     in order to be able to function in school and to develop

10    academically, and without those services, the child cannot do

11    it.

12          THE COURT:  So you're saying the IHO order has no

13    expiration date?  It just continues until when?

14          MR. DE OLIVEIRA:  Until a professional working with

15    the child, because what the professional, the LBA provides

16    reports on the child's development.  To the extent that the

17    IHO -- LBA working with this child still thinks that this child

18    needs those treatments.

19          THE COURT:  You say LBA.  She's not an LBA.

20          MR. DE OLIVEIRA:  The LBA, the RBT.  If that's what

21    the Court would order the district to do, as I said, we don't

22    have an objection to it.  But what I'm saying is the

23    professional working with this child who is recording the data

24    and evaluating the progress of this child and his function and

25    his ability to communicate, to the extent that that professional

**18-CV-594**

1  believes that services are still necessary, I believe that the

2  IHO decision provides for that.  The IHO decision never puts in

3  a deadline on the services.  He said this child needs those

4  services in order to progress academically.  To the extent the

5  child is still progressing academically, I think the services

6  are still needed.

7          Again I analogize to a child in a wheelchair.  When do

8  you stop?  When do you stop providing accessibility for a child

9  with that type of disability?  It's no different here.  It's

10 just a different type of disability, except that if this child

11 is not provided those services early on, which our position is

12 it's already not happening, the window of opportunity for this

13 child to reach that maximum point, that threshold where he or

14 she will be able to -- in this case he will be able to function

15 independently is closing.

16         THE COURT:  If the parents move to a different school

17 district, do they have to get a new IHO, or does that go

18 anywhere all the time?

19         MR. DE OLIVEIRA:  Your Honor, the records from one

20 school transfers to another school when the child has the type

21 of disability.  And we would hope that once the -- if that ever

22 happens, that if this child is moved to a different school, upon

23 reviewing the records provided by the North Syracuse Central

24 School District, that they will provide those services because

25 it's something that --

**18-CV-594**

1        THE COURT:  In other words, the IHO is still in

2   effect?

3        MR. DE OLIVEIRA:  I believe so, Your Honor.  I believe

4   so.

5        THE COURT:  Okay.

6        MR. DE OLIVEIRA:  And the one other point that we

7   raise in our preliminary injunction that the school district has

8   failed to comply with.  We talked about the parents' training.

9   The school district has also failed to provide ABA training for

10  all the staff working with this child.  And again, why is this

11  necessary?  Because if this child, as the affidavits provided by

12  the school witnesses stated, if this child goes out for physical

13  therapy, for speech therapy and the speech therapist is not

14  knowledgeable of ABA methodology, there's not going to be

15  progress on this child's speech.  He can't communicate.

16       Same thing with physical education.  If this child

17  goes to physical education and the physical education teacher is

18  not able to understand that the child has both communication and

19  motor skills limitations and how to address those when a child

20  needs ABA therapy services, if that teacher does not have that

21  training, the child is not going to succeed, going to have

22  regression.

23       And the IHO recognized that based on the testimony,

24  the expert testimony provided at the hearing.  And he found that

25  it is necessary that all staff members working with this child

**18-CV-594**

1    receives this type of training.  The TA working with this child,

2    the IHO ordered that the TA working with the child receive

3    training in the delivery of ABA therapy, which is what Amanda

4    Wise is doing.

5              THE COURT:  While the hearing officer has no

6    expiration date, he issues an order, the IEP does expire; am I

7    correct?

8              MR. DE OLIVEIRA:  Yes.

9              THE COURT:  That is the education plan, and didn't

10   that expire a month ago?

11             MR. DE OLIVEIRA:  Right.

12             THE COURT:  What happens then?

13             MR. DE OLIVEIRA:  That's a distinction, an important

14   distinction that we need to make as well.  We have an order by

15   an IHO involving what services this child needs as a result of

16   his or her disability.  That's a mandate.  An IEP is a document

17   that is prepared by a committee of special education with the

18   teachers in the school district and the parent.  And that

19   changes every year because the child moves grades.  There are

20   different services needed.  But it doesn't erase the mandate

21   that this child needs certain services in order to progress

22   academically.

23             I keep going back to the wheelchair example.  An IEP

24   will change for a child with disability every grade.

25             THE COURT:  It could change if the child began to walk

**18-CV-594**

1   obviously.

2   　　　　MR. DE OLIVEIRA:  If the child begins to walk, it's

3   not an IEP issue.  It's a -- do as you have to provide

4   accommodation for that disability.  It's different.  An IEP is

5   so the child receives the services from school for academic

6   purposes.

7   　　　　THE COURT:  So there's got to be a new one issued

8   shortly, I gather?

9   　　　　MR. DE OLIVEIRA:  For an IEP, an IEP changes depending

10  on the progress of the child in the school year.  As you can see

11  from this record, we have three IEPs drafted between September

12  2018 and May 2019, three IEPs drafted, none of which have been

13  fully agreed by the parents.  But because the committee involves

14  teachers, the majority of the teachers, they make the decisions

15  even though the parents disagree with them.  That's the problem.

16  　　　　THE COURT:  Is that unusual?  In other words, if

17  there's an IEP, does it have to have the consent of the parents?

18  　　　　MR. DE OLIVEIRA:  Absolutely.  That's what the

19  regulations say.  You have to have consent of the parent.  But

20  what is happening in the school district as you see by the IEP

21  is that they have been playing games with the language of the

22  IEP.  They have never put in the IEP that this child needs

23  direct ABA therapy services as the IHO ordered, and my client is

24  here.  He can explain if the Court has any factual --

25  　　　　THE COURT:  Does the IHO order not agree with the IEP

**18-CV-594**

1    or change it?

2            MR. DE OLIVEIRA:  The IHO specifically ordered the

3    school district to revise the IEP to incorporate the mandates of

4    his order.

5            THE COURT:  Did they do that?

6            MR. DE OLIVEIRA:  They did not do that.

7            THE COURT:  I'll hear from them.

8            MR. DE OLIVEIRA:  They have not done that.  So the

9    reason we are here for a preliminary injunction, Your Honor, is

10   that we have -- my clients have tried every other possible

11   avenue.  We have gone to an IHO.  We have gone to Department of

12   Education twice.

13           THE COURT:  You don't like to be here, but I still

14   want you to spell out what specifically are you asking the Court

15   to enjoin or to order the school district to do or not do.

16           MR. DE OLIVEIRA:  We're asking the Court to in essence

17   maintain the status quo.  In our brief, we cited to several

18   cases including a case from the Northern District, Kantak case

19   in which the Court ordered a school district to comply with an

20   IHO's decision.  We're asking this Court to look at the IHO

21   decision and tell the school district you must comply with this

22   IHO decision immediately.

23           THE COURT:  You're saying they're not doing that?

24           MR. DE OLIVEIRA:  They have not done so, Your Honor.

25           THE COURT:  In what way are they not doing it?

**18-CV-594**

1        MR. DE OLIVEIRA:  In what way?

2        THE COURT:  Specifically.

3        MR. DE OLIVEIRA:  They have not provided direct ABA

4   therapy for this child as ordered by the IHO.  They have not

5   trained a teaching assistant which they provided as Ms. Harvey.

6        THE COURT:  Ms. Harvey.

7        MR. DE OLIVEIRA:  Ms. Harvey.  They have not provided

8   this teaching assistant training on the delivery of ABA therapy.

9        THE COURT:  They claim they provided 20 hours of

10  training.  You say it should be 40 hours.

11       MR. DE OLIVEIRA:  The training is spelled out in

12  Ms. Wise's affidavit.  The training requires 40 hours of

13  training.  And in fact, Your Honor, last night I saw an email

14  that was provided by Ms. Reid in support of her opposition.  I

15  must point out the record submitted by AAPSA to defendants are

16  much more comprehensive than those two emails and includes

17  documentation that show that the school district was on notice

18  that the training needed for the TA included RBT training, which

19  is what Amanda Wise is trained to do.  And Amanda Wise was only

20  assigned that job so that the school district would have time to

21  provide that training to Ms. Harvey, which was never done.

22       If the Court would entertain, allow me to introduce

23  this document as evidence in this hearing.

24       THE COURT:  I want to give some time to Ms. Reid.  We

25  don't have much time left.

**18-CV-594**

1          MS. REID:  Thank you, Judge.

2          MR. DE OLIVEIRA:  Right.  I have a copy for Ms. Reid.

3          So this, Your Honor, it's an email exchange between

4    Kathy Wheeler, the principal, and our clients.

5          THE COURT:  Right.

6          MR. DE OLIVEIRA:  And in the email, it says that our

7    clients have agreed to change the IEP to include -- it's on the

8    second page, Judge.  Ms. Wheeler stated that the IEP will be

9    changed to reflect that G.F. will be provided one hour and 15

10   minutes of direct ABA therapy daily four days a week by a

11   licensed RBT therapist under contract by the district.  If you

12   review all the IEPs provided to the Court in this case, this

13   language was never adopted in any of the IEPs.  There was never

14   a reference to direct ABA therapy.

15         THE COURT:  Do you want that?

16         MR. DE OLIVEIRA:  That's what we want.

17         THE COURT:  That's what they're offering?

18         MR. DE OLIVEIRA:  That's what they told the parents

19   they would do, but they never did.

20         THE COURT:  When was that sent?

21         MR. DE OLIVEIRA:  I'm sorry, Judge?

22         THE COURT:  October 11, 2018?

23         MR. DE OLIVEIRA:  Right, right.

24         THE COURT:  Okay.  I'd like to hear Ms. Reid on that

25   too and on everything else.  She'll have ten minutes.  I'd like

**18-CV-594**

1   to get to her now and hear what she has to say.  I've read all

2   your submissions, and after this is over, if either side wants

3   an extra few days to submit something else that came up new

4   here, but I think I have a lot before us and we can get a

5   decision out.

6           But Ms. Reid, go ahead.

7           MS. REID:  Thank you so much, Judge.

8           So before I get started with the argument, I do want

9   to state you began your remarks this morning by stating we all

10  want what's best for this child.  The district unequivocally

11  wants what is best for this child.  And I think what you will

12  see when you review all the papers that have been submitted in

13  this file so far is that this is the epitome of no good deed

14  goes unpunished.  This is a situation where the district has

15  responded to the parents' preferences, the parents' requests to

16  do precisely what the parent has asked, and now they're being

17  hauled into federal court.

18          THE COURT:  You're saying the IHO agreed with you or

19  no?

20          MS. REID:  No.  The IHO disagreed with the district in

21  the first instance.

22          THE COURT:  Right.

23          MS. REID:  Since that time, the district has done

24  everything possible.

25          THE COURT:  To comply with the IHO?

**18-CV-594**

1          MS. REID:  To comply with the IHO, to amend the

2    child's IEP, reflect the preferences advanced by the parent, and

3    the parent is now using something in fact that they requested

4    from the district in the first instance against the district.

5          Last evening, I filed a declaration with an attachment

6    A which reflects correspondence from the parent Ms. F. to AAPSA

7    from October 2018 in which Ms. F. said, "I would prefer that

8    these services be delivered in the classroom as the day goes

9    on," or the precise quote was "on the fly" was the quote.

10   Pushed into the classroom, in other words.  That is precisely

11   what she said.

12         She said I've been working hard to get the services

13   delivered that way.  The district finally has agreed with me

14   thanks to the tireless advocacy of Kathy Wheeler, who is the

15   building principal.  They're going to do it this way.  They're

16   agreeable to Amanda doing it on the fly, quote-unquote.  To

17   which AAPSA replied, "That's great because that's clinically

18   indicated and that's better anyway."

19         That is what we're here -- this is what they're

20   complaining about here today.  They're not complaining about the

21   actual services that are being delivered because, Your Honor, if

22   you review the deposition of Ms. Wise, which was submitted as --

23         THE COURT:  Just yesterday.

24         MS. REID:  Correct, yes.  If you look at that

25   deposition testimony, it is crystal clear.  Ms. Wise begins her

**18-CV-594**

1   testimony by explaining what is ABA therapy.  That was the

2   question I asked her.  Her response was it consists of certain

3   techniques, which include DTTs, NETs, prompting, manding,

4   natural environment, and peer prompting I believe were the

5   examples she gave.  I asked her what she is doing with G.F.

6   today -- well, not today, but before the school year ended in

7   the classroom when she is delivering services to him in the

8   classroom.  She proceeded to enumerate precisely those

9   techniques.

10          THE COURT:  I read that.  You heard what the

11   plaintiffs are specifically asking me to put in a preliminary

12   order.  You heard that?

13          MS. REID:  I did indeed, Your Honor, yes.

14          THE COURT:  You did.  Is there any part of that that

15   you disagree with?

16          MS. REID:  I disagree with all of it, Your Honor.

17          THE COURT:  In what way particularly?

18          MS. REID:  Principally, Your Honor, because opposing

19   counsel's interpretation of the IDEA is creative, but quite

20   frankly, it is turning the IDEA on its head.  An IHO order by

21   definition, by well-established law of this circuit is binding

22   on the IEP that it modifies.  I cited the MC case from the

23   Second Circuit.  I cited as well a Southern District case, which

24   is the student X case, both of which make that very point.

25          The fact that an IHO orders an amendment to an IEP is

**18-CV-594**

1    binding on that school year alone, and the reason for that is

2    because legally the district must reconvene its committee on

3    special education and it must prepare a new IEP for the student

4    in every subsequent school year.  If the parent disagrees with

5    the IEP that's created, it must recommence due process.  It must

6    exhaust.  They must exhaust their administrative remedies.

7         And that is precisely what happened in the MC case and

8    in the student X case.  The parent obtained a favorable decision

9    of the IHO saying actually in the student X case, Your Honor,

10   deliver ABA therapy.  The student needs ABA therapy.

11   Thereafter, eventually the district said, "We don't believe the

12   student requires ABA therapy."  The parent tried to assert that

13   the finding of the IHO in a prior school year was binding on

14   subsequent school years, and the Court rejected that based on

15   the well-established law of the circuit.

16        THE COURT:  You're saying you're not bound by the IHO,

17   the hearing officer's findings because it expired?

18        MS. REID:  Correct.  It expired by operation of law,

19   sir.

20        THE COURT:  When did it expire?  The end of the school

21   year?

22        MS. REID:  Well, certain portions of it.  I think we

23   have to parse what's in the IHO order because there are certain

24   components I do not dispute did continue.

25        THE COURT:  So you're saying it expires in part, not

*JACQUELINE STROFFOLINO, RPR*
*UNITED STATES DISTRICT COURT - NDNY*

**18-CV-594**

1   altogether?

2            MS. REID:  It expires in part, correct, Your Honor.

3            THE COURT:  Who decides what part expires or not?  Me?

4            MS. REID:  The Second Circuit, sir, has clearly said

5   that amendments, that changes to an IEP ordered by an IHO are

6   binding in that school year.  So if we look at the IHO order, we

7   can separate the relief that was ordered into two categories.

8   We have compensatory education.  Under well-established law of

9   this circuit, compensatory education is intended to remedy past

10  denials of FAPE, free appropriate public education.  That was to

11  remedy the parents -- to address the parents' assertion which

12  was founded by the IHO that there had been a denial of FAPE in

13  prior school years while G.F. was in preschool.  That was the

14  relief ordered.

15           THE COURT:  Against you?

16           MS. REID:  Against my client, correct, sir.  However,

17  the IHO also ordered prospective changes to G.F.'s IEP, but the

18  order itself is very clear.  Amend his IEP to reflect X, Y, and

19  Z.

20           THE COURT:  You're saying the prospective findings of

21  the IHO is not binding on you?

22           MS. REID:  It became -- it was binding for the

23  duration of the school year.  However, when in June of 2018 the

24  CSE reconvened, prepared a new IEP for G.F., that IEP by

25  operation of law, and based on the cases we cited in our brief,

**18-CV-594**

1   superseded the past IEP and gave rise to a new cause of action

2   against the district for that school year.

3                  THE COURT:  They've got to come back every year?

4                  MS. REID:  Correct.

5                  THE COURT:  And the IHO's order is ended?

6                  MS. REID:  The IHO's order is ended, Your Honor,

7   except for that compensatory education piece because the IHO put

8   a date of termination on that component of the order.  The IHO

9   said that bank of compensatory education will be available until

10  I believe it's January 1, 2020.  So at that point, that

11  prospective of the order would expire.  The provisions that

12  amended the IEP expire when the IEP expired.

13                 And as I stated, the case law is clear if the parents

14  have a dispute about a subsequent school year, they need to go

15  to due process and exhaust those claims.  There is no reason and

16  there is no legal basis to be here in this court directly

17  disputing the sufficiency of these ABA services.  That in the

18  first instance is the province of an impartial hearing officer.

19                 And you can see based on the minutia of precisely how

20  these services are being delivered, whether it's push-in,

21  pull-out, that should be being adjudicated in an impartial

22  hearing, Your Honor.  That should not be here in federal court

23  in the first instance in front of you because we go back to what

24  is this action about.  This is a claim for damages arising out

25  of violations of the Rehabilitation Act of 1973 when G.F. was in

**18-CV-594**

1  preschool.

2      THE COURT:  I still have to decide that or has that

3  worked out?

4      MS. REID:  I'm sorry, Your Honor?

5      THE COURT:  You're talking about the damages.

6      MS. REID:  The damages claim for preschool is still

7  before you because that claim was permitted to continue.

8      THE COURT:  That's before me?

9      MS. REID:  Correct.

10      THE COURT:  Is that in this proceeding right now?

11      MS. REID:  There's no basis for that to be raised in

12  this particular motion because this motion is a motion for

13  preliminary injunction.

14      THE COURT:  Right.

15      MS. REID:  The complaint does not seek injunctive

16  relief.  We cited a number of cases in our brief that state

17  where the fundamental cause of action is one for money damages,

18  there is no basis for preliminary injunctive relief.  They're

19  seeking money damages for the identical conduct for which they

20  pursued educational relief under the IDEA.  That's what they

21  advanced to the impartial hearing.

22      Now, the Court said the fact that they advanced those

23  same claims in an impartial hearing does not foreclose them from

24  coming to federal court under Section 504.  But it certainly

25  does not mean that they can now bootstrap claims from this

**18-CV-594**

1   school year and subsequent school years onto that claim for

2   damages from prior school years because we go back to the

3   Supreme Court's direction in Fry.

4           The Supreme Court direction in Fry is:  Is this a

5   claim that is uniquely brought by a disabled student and their

6   parent against a school district based on the rights of a

7   disabled student?  If that's the case, that claim must be

8   exhausted.  This issue about Amanda Wise has not been exhausted.

9   There's absolutely no exhaustion of that point.

10          THE COURT:  I'll give you some time to reply to that.

11          MS. REID:  Before you turn, can I just address the

12  substance of the actual merits of the Wise issue?

13          THE COURT:  Go ahead.

14          MS. REID:  Because I think this does bear repeating,

15  Your Honor.  During her deposition, Ms. Wise at no point could

16  identify any restriction that any individual in the school

17  district placed on her.  In fact, she testified that she hasn't

18  spoken to anyone in the school district about wanting to deliver

19  these services as a push-in service.

20          And furthermore, as the documentation that we

21  submitted last night suggests, this was a -- the decision to

22  provide the services on a push-in basis was based on a request

23  from the parent in the first instance.  That was not based on

24  the district initiating services in that way.  So really what

25  they're objecting to is not the nature of the services.  It's

**18-CV-594**

1    where the services are being delivered.  The IEP is silent on

2    that point.

3           And if I could address one other point raised by my

4    opponent as well is simply factually incorrect, and that is the

5    assertion that the district never reconvened CSE to adopt an IEP

6    that was consistent with the IHO's order.  That is flatly

7    refuted by the record.

8           Exhibit 7 of the DiFlorio affidavit that we already

9    filed in our opposition contains the IEP that was formulated in

10   response to the IHO's order, and it hits every point in that

11   decision.  There is nothing that is omitted.  What they are

12   disputing is whether that IHO order continued into the school

13   year, and the law is crystal clear it didn't, Your Honor.

14          THE COURT:  You're saying it expired?

15          MS. REID:  It expired.  It did.

16          THE COURT:  And his order expired?

17          MS. REID:  Except for those portions pertaining to the

18   compensatory services, correct.

19          MR. DE OLIVEIRA:  Your Honor, the legal arguments

20   involving the IDEA versus the Rehabilitation Act has been fully

21   briefed by the Court.  In fact, I think it's law of the case

22   that Your Honor already decided.  So I'm not going to bore the

23   Court with that.

24          I just want to point out one issue that Ms. Reid

25   argued with respect to the email that she attached to her

**18-CV-594**

1   affidavit, and I actually think that that goes to exactly what

2   we're talking about because in the email, April F., the mother

3   of the child and my client, specifically says it's best if

4   Amanda did direct ABA therapy on the fly throughout the day when

5   she's already there.

6            So what we're claiming is that we even agreed to allow

7   Amanda Wise who is not an LBA or BCBA to provide direct ABA

8   therapy service to the child during the day, but it never

9   happened.  The defendants cannot rebut that.  They cannot

10   provide any evidence that any direct ABA therapy was provided to

11   this child after October 2018.  Amanda Wise testified with

12   respect to that.  Angela Saturno testified with respect to that.

13   Dr. Friga testified with respect to that, and they have no way

14   of proving otherwise.

15            One other issue that I want to point out, Your Honor,

16   is by the way, Amanda Wise did testify about how her work was

17   restricted in her affidavit, and Your Honor, it's provided to

18   the Court.  The Court can read it, but the parent is here.

19   Mr. F. is here.  So to the extent the Court has any questions

20   about any factual issues involving what the parents in fact told

21   the school district or what the parents in fact asked the school

22   district to do or what the parents in fact challenged from the

23   school district, he is right here, Your Honor.

24            THE COURT:  At this point, I'm just going to go by the

25   papers that are submitted.  I don't think I have to do that at

**18-CV-594**

1   this point.

2          Were you going to add something?

3          MS. REID:  I was just going to state, Your Honor, that

4   the order was changed to reflect that this was not an

5   evidentiary hearing.  As a result, I do not have any witnesses

6   here, and I would strenuously object.

7          THE COURT:  I'm not going to do that.  Look.  There's

8   an awful lot of interesting issues here.  The important thing is

9   to take care of the child.  We're all trying to do that.  I'm

10  not sure the school isn't trying hard to do what it can.  You

11  both disagree.

12         It's interesting if the parents themselves want

13  something for a child and the school district disagrees, and

14  then I've got to look at the IEP and the IHO order.  But it

15  seems that the wishes of the parents is a factor to be

16  considered.  But I'm going to look at this all and check the

17  law.  That's the key thing, and I'll try to get a decision out

18  pretty quickly.

19         Yes?

20         MS. REID:  Just one final word on that, sir, because I

21  didn't speak to that assertion.  The assertion of my opponent

22  was that the parent must agree with an IEP.  That is also

23  completely refuted by all the law of the circuit.  The law is

24  crystal clear.  The parent is a mandatory participant at the

25  CSE, but the Second Circuit has held that being a participant

**18-CV-594**

1    means having the right to participate in the meeting and to

2    share your views.  It does not mean the right to dictate the

3    IEP.  So to the extent that Mr. De Oliveira said if the parent

4    doesn't agree, that doesn't permit the IEP to go forward, that's

5    completely contrary to black letter law.

6              THE COURT:  You disagree with that?

7              MR. DE OLIVEIRA:  Your Honor, no.  The point I made

8    was that the parents are going against the school district.  The

9    school district brings all the teachers into the IEP, and they

10   eventually make the decisions irrespective of what the parents

11   are saying.  Point being is what is in the IEP is not

12   necessarily what the parents have agreed to, and they have

13   vocally expressed that over and over, and the record will show

14   that.

15             Two more points, Your Honor, and I apologize.

16   Ms. Reid mentioned Exhibit 7, the DiFlorio affidavit, which

17   includes IEP from I believe June 2018.  Question is:  Was the

18   IEP ever implemented?  In our position, it was not for the

19   reasons set forth in our affidavit.

20             And then finally, with respect to the IHO's order

21   expiring, the Education Department, New York State Education

22   Department disagreed.  The Education Department has issued a

23   decision in 2018 and 2019 finding that the school district was

24   still in violation of the IHO's order.

25             THE COURT:  I'll be looking into all of that and try

**18-CV-594**

1    to get a decision out pretty quickly.  I thank you for all of

2    your input.

3              THE CLERK:  All rise.  Court is adjourned.

4                    (The matter adjourned at 12:09 p.m.)

5

6              CERTIFICATION OF OFFICIAL REPORTER

7

8

9         I, JACQUELINE STROFFOLINO, RPR, Official Court Reporter,

10   in and for the United States District Court for the Northern

11   District of New York, do hereby certify that pursuant to Section

12   753, Title 28, United States Code, that the foregoing is a true

13   and correct transcript of the stenographically reported

14   proceedings held in the above-entitled matter and that the

15   transcript page format is in conformance with the regulations of

16   the Judicial Conference of the United States.

17

18         Dated this 18th day of July, 2019.

19

20         **/s/ JACQUELINE STROFFOLINO**

21         JACQUELINE STROFFOLINO, RPR

22         FEDERAL OFFICIAL COURT REPORTER

23

24

25