UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ROBERT F., *Individually and as Guardians Ad Litem of G.F., a minor*, and APRIL F., *Individually and as Guardians Ad Litem of G.F., a minor*,

                                          **Plaintiffs,**

   vs.                                       5:18-CV-00594 (MAD/ATB)

NORTH SYRACUSE CENTRAL SCHOOL DISTRICT, NORTH SYRACUSE BOARD OF EDUCATION, ANNETTE SPEACH *in her official capacity as Superintendent of Schools*, and DAWN HUSSEIN *in her official Capacity as Principal and Committee on Pre-School Education Chair*,

                                          **Defendants.**
_____

**APPEARANCES:**

**COOPER, ERVING & SAVAGE, LLP**
39 North Pearl Street, 4th Floor
Albany, New York 12207
Attorneys for Plaintiffs

**LINNAN & ASSOCIATES**
39 North Pearl Street - Suite 4
Albany, New York 12207
Attorneys for Plaintiffs

**BOND SCHOENECK & KING, PLLC**
One Lincoln Center
Syracuse, New York 13202
Attorneys for Defendants

**OF COUNSEL:**

**CARLO ALEXANDRE C. DE OLIVEIRA, ESQ.**
**MATTHEW E. MINNIEFIELD, ESQ.**
**PHILLIP G. STECK, ESQ.**

**JAMES D. LINNAN, ESQ.**

**JONATHAN B. FELLOWS, ESQ.**
**KATE I. REID, ESQ.**

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    On May 18, 2018, Plaintiffs Robert F. and April F., individually and as guardians ad litem of their minor son, G.F., commenced this action against Defendants North Syracuse Central

School District (the "District"), North Syracuse Board of Education (the "Board"), Annette Speach, and Dawn Hussein, alleging discrimination on the basis of disability in violation of Section 504 of the Rehabilitation Act. *See* Dkt. No. 1. Trial is scheduled to commence on May 30, 2023. Currently before the Court is Plaintiffs' motion *in limine*, *see* Dkt. No. 112, and the District's motion *in limine*, *see* Dkt. No. 128.

## II. DISCUSSION

A. **Legal Standards**

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996); *Nat'l Union Fire Ins. Co. of Pittsburgh v. L.E. Myers Co.*, 937 F. Supp. 276, 283 (S.D.N.Y. 1996). "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *United States v. Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001). "[C]ourts considering a motion *in limine* may reserve decision until trial, so that the motion is placed in the appropriate factual context." *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011) (citing *Nat'l Union Fire Ins. Co.*, 937 F. Supp. at 287). Further, a district court's ruling on a motion *in limine* is preliminary and "subject to change when the case unfolds." *Luce*, 469 U.S. at 41. The moving party bears the burden of establishing that evidence is inadmissible for any purpose and so properly excluded on a motion *in limine*. *See United States v. Pugh*, 162 F. Supp. 3d 97, 101 (E.D.N.Y. 2016).

B. **Plaintiffs' Motion *In Limine***

Plaintiffs' motion *in limine* seeks to (1) preclude Defendants, under the doctrine of collateral estoppel, from offering any testimony or evidence contrary to the findings made by the

2

impartial hearing officer ("IHO"); (2) exclude Defendants' expert witness; and (3) have the Court instruct the jury on certain allegedly uncontested issues. *See* Dkt. No. 112-1. Defendants oppose every aspect of the motion. *See* Dkt. No. 121.

### *1. Collateral Estoppel*

On September 22, 2017, Plaintiffs filed a request for a hearing before an IHO, alleging that G.F. had been denied his rights under the Individuals with Disabilities Education Act ("IDEA"). *See* Dkt. No. 100 at 4. The IHO issued a decision on January 31, 2018, ruling that the programs set forth in G.F.'s preschool individualized education program ("IEP") denied him the free appropriate public education ("FAPE") the IDEA requires. *See id.* at 4-5; *see also* Dkt. No. 84-34. Plaintiffs now argue that Defendants are collaterally estopped from offering any evidence or testimony "contrary to the ... findings of fact made by the IHO" because "Defendants had a full and fair opportunity to litigate [these] issues ... which were finally decided by the IHO on [the] merits." Dkt. No. 112-1 at 7. In opposition, Defendants argue that none of the IHO's determinations should bind the parties in this action because the issues considered by the IHO were decided under the IDEA, while "the sole issue before this Court is whether G.F. was subjected to disability discrimination in violation of Section 504." Dkt. No. 121 at 9.

Collateral estoppel bars relitigation of a legal or factual issue that was previously decided where:

> "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits."

*Washington v. N.Y. City Dep't of Educ.*, 740 Fed. Appx. 730, 732 (2d Cir. 2018) (quoting *Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001)).

3

The Court finds that Defendants are not limited by the principles of collateral estoppel with respect to the IHO's decision. The "Second Circuit has held that even under [the] common law [principles of collateral estoppel], an unreviewed state administrative decision has no preclusive effect on ADA claims ... , and at least one court in the Second Circuit has held similarly with respect to Section 504 claims." *K.C. v. Chappaqua Cent. Sch. Dist.*, No. 16-CV-3138, 2017 WL 2417019, *6 (S.D.N.Y. June 2, 2017) (citing *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 735 (2d Cir. 2001) (holding that determinations of the New York State Division of Human Rights had no preclusive effect on subsequent employment discrimination claims under the ADA); *Telesca v. Long Island Hous. P'ship, Inc.*, 443 F. Supp. 2d 397, 405 (E.D.N.Y. 2006) ("[I]t is well-settled that unreviewed administrative determinations [of the New York State Division of Human Rights] have absolutely no preclusive effect on discrimination claims [under Section 504]")). Here, the IHO determination was not appealed and has not been subject to any judicial review. *See* Dkt. No. 1 at ¶ 37; *see also* Dkt. No. 5 at ¶ 37. Therefore, this unreviewed administrative decision has no preclusive effect on the Section 504 claims in this case.

Furthermore, the "[u]se of collateral estoppel 'must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts *and applicable legal rules* remain unchanged.'" *Faulkner v. Nat'l Geographic Enters., Inc.*, 409 F.3d 26, 37 (2d Cir. 2005) (emphasis added) (quoting *Comm'r v. Sunnen*, 333 U.S. 591, 599-600 (1948)). It is clear that the legal rules that were applied by the IHO under the IDEA are different from the legal rules that will be applied by this Court under Section 504. *See K.C.*, 2017 WL 2417019, at *7 ("'[T]he scope of protection under [Section 504] differs from that under the IDEA' in that 'Section 504 offers relief from discrimination, whereas

4

[the] IDEA offers relief from inappropriate education placement, regardless of discrimination'") (quotation omitted); *see also Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010) ("'Section 504 relief is conditioned on a showing of discrimination, [which] requires something more than proof of a mere violation of IDEA—*i.e.*, more than a faulty IEP'") (quotation omitted).

Accordingly, Plaintiffs' motion *in limine* is denied to the extent that it seeks to preclude Defendants from offering any testimony or evidence contrary to the IHO's findings under the doctrine of collateral estoppel.

### 2. Defendants' Expert Witness

Plaintiffs argue that Defendants' expert witness, Dr. Stephen Sheinkopf, "should be excluded because his testimony and opinion are speculative and not supported by reliable scientific principles and methods." Dkt. No. 112-1 at 11 (capitalization omitted). Defendants counter that no portion of the Sheinkopf Report or testimony should be precluded or limited because Plaintiffs' arguments "rest[] ... entirety on mischaracterizations and manipulations of Dr. Sheinkopf's Report and opinions." Dkt. No. 121 at 11.

Under Rule 702 of the Federal Rules of Evidence, a witness may testify as an expert if he or she is qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. If a witness qualifies as an expert, Rule 702 allows for their testimony when:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the

5

      facts of the case.

*Id.* In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court clarified that the district court holds the gatekeeping function of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. The court's gatekeeping role extends "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting Fed. R. Evid. 702).

      To gauge the reliability of proffered testimony, "the district court should consider the indicia of reliability identified in Rule 702," which are not exhaustive. *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004). The district court may consider additional factors identified in *Daubert*, including (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) in the case of a particular scientific technique, the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained "general acceptance." *Daubert*, 509 U.S. at 593-94.[1] The district court's inquiry into the reliability of expert testimony is "flexible," and *Daubert* factors are neither exclusive nor dispositive, *id.* at 594-95; they "neither necessarily nor exclusively appl[y] to all experts or in every case," *Kumho Tire Co., Ltd.*, 526 U.S. at 141. The district court has "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate

---

[1] Courts have noted that the traditional *Daubert* reliability factors are of "limited utility" in the context of cases of this nature, where the proposed conclusions and reasoning are rooted in a social science, rather than a hard science. *See, e.g., Vinel v. Union Twp.*, No. 1:16-cv-930, 2018 WL 7080037, *6 (S.D. Ohio Apr. 13, 2018); *see also Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001) (holding that the *Daubert* factors "are not dispositive in every case" and should be applied "only where there are reasonable measures of reliability of expert testimony").

reliability determination." *Id.* at 142.

The burden is on the party proffering the expert to demonstrate that the expert testimony is admissible by a preponderance of the evidence. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); Fed. R. Evid. 702 Advisory Committee's Note to the 2000 Amendment. "The Second Circuit's standard for admissibility of expert testimony is 'especially broad.'" *United States v. Herron*, No. 10-CR-615, 2014 WL 1871909, *6 (E.D.N.Y. May 8, 2014) (quotation omitted); *see also Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 332 (E.D.N.Y. 2002) (collecting cases). The "rejection of expert testimony is 'the exception rather than the rule.'" *Clarke*, 219 F. Supp. 2d at 332 (quoting Fed. R. Evid. 702 Advisory Committee's Note to the 2000 Amendment). Because Rule 702 "embodies a liberal standard of admissibility for expert opinions," the assumption the court starts with is that a well-qualified expert's testimony is admissible. *See Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005); *see also In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007)).

Plaintiffs first argue that Dr. Sheinkopf cannot opine on whether intensive ABA therapy would have allowed G.F. to function in a regular education classroom or to achieve substantial levels of independence later in his development because his opinion is "based on his assumption that G.F. possesses a genetic defect that affects his intellectual abilities" and Dr. Sheinkopf "is unqualified to testify about genetics ... ." Dkt. No. 112-1 at 13.  In opposition, Defendants argue that Dr. Sheinkopf's opinion is "based on his extensive review of G.F's medical history as well as his years of knowledge and extensive experience as a clinical and developmental psychologist, with a specialization in Autism Spectrum Disorders." Dkt. No. 121 at 12.

The Court has carefully reviewed Dr. Sheinkopf's report and concludes that his opinion on the lack of reliable scientific evidence on the efficacy of intensive ABA therapy rests on a reliable

foundation. In the report, Dr. Sheinkopf concluded that, "based on [his] clinical experience and [his] knowledge and reading of the peer review[ed] scientific literature," Plaintiffs' claim that "the failure of the school to provide ABA services was a 'substantial factor in causing G.F. to suffer irreversible personal injury and harm,'" could not "be made with reasonable certainty." Dkt. No. 91-9 at 18. Dr. Sheinkopf then elaborates, stating that "it is impossible to state with any degree of certainty that increased intensity of ABA services would have resulted in G.F. developing substantially greater and more fluent and functional use of speech in the near term, and [it] is impossible to state with any degree of certainty that he would have developed independence in school functioning and later activities of daily living and vocational skills." *Id.* at 19. Dr. Sheinkopf bases this finding on his analysis of the opinions in Dr. Lopez-Williams' and Dr. Schonfeld's reports, which he found to be either inconsistent with the published literature or resting on "anecdotal clinical experience ... , qualitative comments of progress that do not match up with actual data from the ABA agency, and partial reliance on the high IQ score from 2019 that was from a non-standard test administration ... ." *Id.* at 19-20.

  The Court has reviewed Dr. Sheinkopf's brief discussion of Dr. Nutt's recommendation for genetic testing and finds that his specific finding there—that a hypothetical positive genetic test "would reasonably be assumed to reduce the likelihood of optimal outcomes"—arises from a reliable foundation, namely, his review of peer-reviewed literature and his knowledge and experience as a clinical and developmental psychologist with a special expertise in Autism Spectrum Disorders. *Id.* at 5; *see also id.* at 1, 4-5. Moreover, Dr. Sheinkopf raised genetic testing only in his "Introduction & Background" section, during the discussion of Dr. Nutt's recommendation; Dr. Sheinkopf does not otherwise mention or rely on genetic testing in his "Summary and Conclusions" section. *Id.* at 1, 4-5, 18-20.

Plaintiffs next argue that Dr. Sheinkopf cannot speculate on how school personnel viewed Dr. Nutt's recommendation for a least restrictive setting and intensive behavioral services because he "had no factual or scientific basis to make such speculative opinion" and his testimony is "at odds with the laws in the State of New York." Dkt. No. 112-1 at 14. As relevant here, Dr. Sheinkopf opined that

> [Dr. Nutt's] recommendation for classroom placement in a least restrictive environment could be inferred to mean that the school should have attempted to place G.F. in a classroom made up in part by typical peers. ... Depending on how the school interprets the phrase "least restrictive educational environment", one could imagine that school personnel could have seen the recommendation for least restrictive setting and intensive behavioral services through the school to have been at odds.

Dkt. No. 91-9 at 4. Defendants do not address this argument, and it is not clear to the Court that Dr. Sheinkopf can reliably testify on how school official would have viewed Dr. Nutt's recommendation. Therefore, the Court will preclude Dr. Sheinkopf from offering an opinion on this limited issue.

Plaintiffs also object to several statements made by Dr. Sheinkopf regarding "Defendants' 'attempts' to provide ABA therapy techniques to G.F." Dkt. No. 112-1 at 16-18. The Court has reviewed the objected-to statements and concludes that Dr. Sheinkopf is merely summarizing the reports he reviewed, not offering an opinion on Defendants' "attempts" to provide ABA therapy to G.F. *Id.* at 16. In particular, Dr. Sheinkopf never attempts to assert that Defendants used Developmental Individual-differences ("DIR")—an ABA therapy technique—on G.F. Rather, he observed that, although progress reports from the school counselor appeared "to be consistent with the general goals and strategies of DIR," those reports did not "clearly state whether the therapist was utilizing ... DIR" or "whether the school made attempts to implement [the DIR] recommendation." Dkt. No. 91-9 at 4. Similarly, Dr. Sheinkopf did not attempt to "critique" the

9

number of hours of ABA therapy Dr. Bronk and Dr. Grassl recommended. Dkt. No. 112-1 at 16. A review of the report reveals that Dr. Sheinkopf merely noted that Dr. Grassl did not specify "the definition of 'intensive'" when recommending "intensive applied behavior analysis services," Dkt. No. 91-9 at 3, and that Dr. Bronk did not make a "specific recommendation [on a] number of hours per week" when she recommended using ABA methodology, *id.* at 5.

   Finally, Plaintiffs argue that Dr. Sheinkopf's opinion and testimony "is too contradictory and unrealistic to be admissible under Rule 702." Dkt. No. 112-1 at 22. The Court disagrees. It is true that Dr. Sheinkopf has acknowledged that "'ABA treatment programs can be effective ways to teach specific skills,'" Dkt. No. 121 at 16 (quoting Dkt. No. 91-9 at 19), and that "it would have been clinically appropriate to recommend that G.F. receive ABA services, including full-day services, as a preschooler," *see id.* at 17 (citing Dkt. No. 92-2 at ¶ 31; Dkt. No. 91-7 at ¶ 16). These opinions, however, do not preclude Dr. Sheinkopf's ultimate conclusion that "the evidence offered in ... Plaintiffs' expert reports and in sections of testimony offered by ABA service providers" did not support Plaintiffs' claim that ABA treatment programs "would have been certain to result" in the kind of gains that their experts suggested. Dkt. No. 91-9 at 20. In other words, Dr. Sheinkopf's statements on the general utility of ABA treatment programs does not mean that he must agree with Plaintiffs' experts on the outcome that would have resulted if G.F. had received those services.[2] To the extent that Plaintiffs argue that there are further gaps or inconsistencies in Dr. Sheinkopf's reasoning or that his conclusions are unfounded, such arguments "'go to the weight of the evidence, not to its admissibility.'" *United States Sec. & Exch. Comm'n v. Vali Mgmt. Partners*, No. 21-453, 2022 WL 2155094, *2 (2d Cir. June 15,

---

[2] Plaintiffs' reliance on statements made in paragraph 23 of Dr. Sheinkopf's declaration is clearly misplaced inasmuch as that paragraph does not contain Dr. Sheinkopf's opinion; it is merely summarizing the findings of someone else's study. *See* Dkt. No. 92-2 at ¶ 23.

2022) (quoting *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017)).

In sum, Plaintiffs' motion to preclude Dr. Sheinkopf's opinion and testimony is granted only to the extent that Dr. Sheinkopf opines on how school personnel might have viewed Dr. Nutt's recommendation for both a least restrictive setting and intensive behavioral services. Plaintiffs' motion to preclude Dr. Sheinkopf's opinion and testimony is otherwise denied.

### 3. Instructions to the Jury

Plaintiff requests that, should the Court decline to exclude the opinion and testimony of Dr. Sheinkopf, the Court should instruct the jury that all the experts agree on the following statements:

> 1. "ABA is an effective option as part of a range of treatment and educational options."
>
> 2. Studies of ABA treatment for young children with autism shows the "positive effects of ABA interventions on a long range of outcomes … [including] positive effects on IQ, language abilities, and adaptive skills."
>
> 3. That "statistical analyses did indicate a correlation between hours per week [of ABA] and outcome."
>
> 4. That the "[p]roven utility of ABA treatment has motivated efforts to mandate that private insurers pay for such services."
>
> 5. That "given the available evidence and options, a recommendation of intensive full-day ABA would be been reasonable for G.F."

Dkt. No. 112-1 at 24-25 (quotations omitted). The Court declines to do so. Initially, several of these quotes do not even represent Dr. Sheinkopf's opinion; rather, they are his summary of someone else's study, whose results he then proceeds to question. *See* Dkt. No. 92-2 at ¶¶ 23-24. The remainder of these quotes are taken out of context and risk suggesting to the jury that the parties experts agree on issues that they do not, in fact, agree on. If any of these issues are truly

uncontested, the parties can—and should—come together before trial to stipulate to those facts.

Accordingly, Plaintiffs' motion is denied to the extent it seeks to have the Court instruct the jury that all the experts agree on certain issues.

**C.      Defendants' Motion *In Limine***

Defendants' motion *in limine* seeks to preclude Plaintiffs' November 18, 2021, expert damages report by Dr. Reagles, *see* Dkt. No. 128-3 (the "Revised Report"), because (1) the Court "already assessed the insufficiency of" the Revised Report in the September 16, 2021 Memorandum-Decision and Order (the "September 16 Order") and it "should not deviate from its prior determination," Dkt. No. 128-1 at 10-13; and (2) the Revised Report is inadmissible because its "assumptions are conclusory, speculative, and completely unsupported by competent peer-reviewed research," *id.* at 13-16.  Plaintiffs oppose the motion, arguing that the Revised Report finds adequate grounding in Dr. Lopez-Williams' expert opinion, and is neither speculative nor unreliable.  *See* Dkt. No. 129.

The holdings of the September 16 Order do not directly preclude the Revised Report.  As Defendants acknowledge, the September 16 Order precluded Dr. Reagles March 4, 2020 report (the "Initial Report") "because of its reliance on Dr. Schonwald's inadmissible opinions" and the Revised Report has removed all references to "Dr. Schonwald or her opinions in the section of his report where [the report] draws conclusions about G.F.'s future employability." Dkt. No. 128-1 at 10.[3]  The September 16 Order did not otherwise discuss or examine the Initial Report.

Therefore, the issue before the Court is whether the Revised Report rests on a reliable

---

[3] The precluded portion of Dr. Schonwald's opinion discussed G.F.'s long-term prognosis and opined that it was "'possible that [G.F.'s] trajectory would have been far more reassuring had he received intensive ABA as soon as possible after his diagnosis was made.'"  Dkt. No. 101 at 8 (quoting Dkt. No. 92-7 at 14).

foundation. Defendants argue that—without the ability to rely on Dr. Schonwald's conclusions regarding G.F.'s long-term prognosis—the Revised Report is without a reliable foundation for Dr. Reagles' conclusion that G.F. "'will never be employable in any capacity in the competitive labor market environment.'" Dkt. No. 128-1 at 14 (quoting Dkt. No. 128-3 at 33). The Court disagrees. The Revised Report explicitly relies on Dr. Lopez-Williams' forensic neuropsychological evaluation of G.F., in which Dr. Lopez-Williams opined, as relevant here, that

> "[T]here is strong evidence to support that early and intensive intervention employing ABA therapy leads to greater likelihood of positive, long-term outcomes. Research has also supported that potential for improvement is likely attenuated in children with ASD as they transition into middle and late childhood owing to differences in critical periods of neuroplasticity.
>
> \* \* \*
>
> A direct comparison of structured and standardized assessments conducted since 2014, including the ADOS and adaptive functioning assessments, support that [G.F.] has not only failed to make significant progress, but his symptoms and impairment have worsened in several areas including social communication; restricted, repetitive behaviors; and self-regulation.
>
> \* \* \*
>
> [G.F.]'s failure to make clinically significant improvement and his worsening in functioning since his initial assessment and diagnosis of Autism Spectrum Disorder is attributable to the failure of [the District] to provide him with the type and amount of services that he required, and within the critical window of child development (i.e. ages 2 to 5 years).
>
> \* \* \*
>
> Based upon his documented worsening of functioning over several years and his approaching the end of his critical period of neuroplasticity, [G.F.]'s prognosis is poor and he is likely relegated to a lifetime of impairment in major domains of functioning.
>
> \* \* \*

> [G.F] is extremely unlikely to be able to develop the necessary skills to complete higher education and maintain gainful employment and will, therefore, require financial supports."

Dkt. No. 128-3 at 24-26 (quoting Dkt. No. 92-5 at 5-7) (emphasis omitted). Dr. Lopez-Williams' report and testimony has already been found admissible by the September 16 Order, *see* Dkt. No. 101 at 6 (holding that Dr. Lopez-Williams' report and testimony rested "on a sufficiently reliable foundation of professional studies and clinical experience"), and Dr. Reagles is permitted to rely on Dr. Lopez-Williams' findings when forming his opinion, *see In re M/V MSC FLAMINIA*, No. 12-CV-8892, 2017 WL 3208598, *22 (S.D.N.Y. July 28, 2017) ("It is well established that an expert may rely upon another expert to form an opinion under Rule 703, which provides that an expert may rely upon the opinion of another '[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject'") (quotation and citations omitted). As was noted in the September 16 Order, to the extent that Defendants feel there may be a lack of peer reviewed literature or studies supporting the Dr. Reagles' opinion, that issue can be explored on cross examination. *See Peerless Ins. Co. v. Broan-NuTone LLC*, No. 3:10-CV-0868, 2012 WL 1288196, *2 (D. Conn. Apr. 16, 2012) ("[T]he absence of peer review alone does not warrant excluding the testimony of [experts]").

Accordingly, Defendants' motion *in limine* is denied.

### III. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion *in limine* (Dkt. No. 112) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that the District's motion *in limine* (Dkt. No. 128) is **DENIED**; and the Court

further

      **ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 21, 2023
       Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge