UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ROBERT F. and APRIL F., Individually and as
Guardians *Ad Litem* of G.F., a minor,

                                    Plaintiffs,

               -against-

NORTH SYRACUSE CENTRAL SCHOOL
DISTRICT *et al.*,

                                Defendants.

Civil Case No.: 5:18-CV-594
(LEK/ATB)

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTIONS *IN LIMINE*

---

Respectfully submitted,

**COOPER ERVING & SAVAGE LLP**

Dated: May 9, 2023
      Albany, New York

/s/ Carlo A. C. de Oliveira
Carlo A. C. de Oliveira, Esq.
Bar Roll No.: 516271
Attorneys for Plaintiffs
39 North Pearl Street
Albany, New York 12207-2797
(518) 449-3900

# TABLE OF CONTENTS

**I.      DEFENDANTS ARE BOUND TO FACTS ALREADY ADMITTED** .......................................................... 3

**II.     DEFENDANTS ARE BOUND TO FACTS WHICH THEY FAILED TO DENY IN THEIR STATEMENT OF MATERIAL FACTS** ......................................................................................... 13

**III.    THE IMPARTIAL HEARING DECISION SHOULD BE ADMITTED INTO EVIDENCE BECAUSE IT IS AN AUTHENTIC DOCUMENT WHICH THE COURT MAY TAKE JUDICIAL NOTICE OF** ................................................................................................................................................ 25

**IV.     STATEMENTS OF DEFENDANTS' EMPLOYEES RELATED TO MATTERS WITHIN THE SCOPE OF THEIR AGENCY ARE ADMISSIBLE AS STATEMENTS OF A PARTY OPPONENT UNDER FRE 801(d)(2)(D)** .......................................................................................................................... 26

**V.      POLICIES OF DEFENDANTS WHICH WERE AUTHENTICATED BY FED. R. CIV. P. 30(B)(6) DEPONENTS ARE AUTHENTIC AND NOT INADMISSIBLE HEARSAY** ................................... 27

**VI.     ALL RECORDS PRODUCED BY DEFENDANTS AS PART OF G.F.'S SCHOOL RECORDS ARE REASONABLY AUTHENTIC AND NOT INADMISSIBLE HEARSAY** .......................................... 29

**VII.    OFFICIAL RECORDS, CERTIFIED TRANSCRIBED RECORDS AND RECORDINGS OF CPSE AND CSE MEETINGS, AND THE TESTIMONY RECEIVED AT IMPARTIAL HEARINGS ARE SELF-AUTHENTICATED** .................................................................................................................. 32

**VIII.   EVIDENCE OF DEFENDANTS' NON-COMPLIANCE SHOWING DELIBERATE INDIFFERENCE AFTER THE FILING OF PLAINTIFFS' COMPLAINT IS ADMISSIBLE AS BACKGROUND EVIDENCE REGARDING MOTIVE** ................................................................. 34

**IX.     COURT SHOULD INSTRUCT THE JURY ON THE "LOST CHANCE DOCTRINE" –** *IA NY PJI 2:70.* ............................................................................................................................................. 37

## I.    <u>DEFENDANTS ARE BOUND TO FACTS ALREADY ADMITTED</u>

"[A]dmissions in a counter-statement of material fact constitute judicial admissions to which a party is bound." *Vogel v. CA, Inc*., 44 F. Supp. 3d 207, 211 (D. Conn. 2014) (citing *Setevage v. Dep't of Homeland Sec*., 539 Fed. Appx. 11, 13 (2d Cir. 2013)).  Defendants' prior admissions in its answer and, subsequently, in its responses to plaintiffs' statement of material facts are admissions that are binding on the defendants. *Am. Airlines v Worldwide*, 2008 US Dist LEXIS 141687, at *30, n 22 (E.D.N.Y. 2008) ("Regardless of whether the statement is a formal judicial admission, the fact that it is binding [and] removes any issue of material fact as to whether the [fact is true]); *Upstate NY Engrs. Health Fund v Dipizio Constr. Co.*, 2017 US Dist LEXIS 109388, at *12 (N.D.N.Y. 2017) (denying defendants' motion to amend answer and holding defendants bound by admissions in answer).  In the present case, Plaintiffs should be permitted to present the following facts as undisputed facts to the Jury:

1. Plaintiffs Robert F. and April F. are the natural parents of their son, plaintiff G.F. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 1] (admitted).**

2. G.F. was diagnosed with autism spectrum disorder and classified by the defendants' Committee on Preschool Special Education ("CPSE") as a student with disability qualified to participate in school activities. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 2] (admitted).**

3. Defendant, The North Syracuse Central School District ("School District"), is a public school receiving federal financial assistance. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 3] (admitted).**

4. Defendant, The North Syracuse Central School District Board of Education, is the governing body of defendant School District. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 4] (admitted).**

5. At all relevant times, Defendants were aware that Applied Behavior Analysis ("ABA") is a type of behavioral services available for teaching students with autism spectrum disorder. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 5] (admitted).**

6. Discrete Trial Training (DTT) is an ABA technique defined as "Intensive 1:1 instructional technology that breaks skill acquisition into antecedent (SD); behavior (response); and consequence (reinforcement or extinction) (A-B-C)." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 10] (admitted).**

7. Intensive ABA treatment "is typically provided in structured therapy sessions, which are integrated with more naturalistic methods as appropriate **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 14] (admitted).**

8. Once the one-on-one intensive ABA therapy is successful in a clinical environment, the treatment must then be generalized to other natural environments such as the patient's home or school or both. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 16] (admitted).**

9. The combination of early and intensive ABA therapy has been shown to result in statistically and clinically significant gains in intellectual, language, and adaptive functioning in children with ASD, compared to typical, school-based services. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 17] (admitted).**

10. Based on his diagnosis and behaviors interfering with his functioning, G.F. was recommended as an "excellent candidate for intensive applied behavior analysis services as supports" by Dr. Corey Grassl, and that "***[i]nterventions will require the efforts of his***

*parents, school personnel, and behavioral health care providers*." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 23] (admitted).**

11. A Developmental Progress Report dated January 14, 2015 provided to Defendants' CPSE stated that G.F. "was recently evaluated and diagnosed with Autism. [G.F.]'s parents are committed to helping [G.F.] achieve his goals," and that the "family is interested in adding ABA therapy" in school. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 24] (admitted).**

12. As of April 2015, Defendants knew that "**[G.F.] struggled to remain engaged with any of the therapists who attempted to either present test materials to him or tried to engage him in play with a variety of toys in the therapy room.**" **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 25] (admitted).**

13. G.F.'s IEP dated April 27, 2015, identified various autism-related behaviors that were interfering with G.F.'s speech and language development. The IEP provided for speech and language services of 30 minutes four times per week, and did not recommend a behavioral intervention plan to address behaviors impeding on G.F.'s learning nor did the CPSE recommend ABA therapy for G.F. in school. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 31] (admitted).**

14. During the 2015-2016 School Year, G.F. was placed in Defendants' Early Education Program ("EEP"), a half-day integrated special education program at Defendants' Main Street School. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 33] (admitted).**

15. In March 2016, an evaluation conducted Dr. Robert Nutt when G.F. was 3 years and 3 months old found that G.F. remained nonverbal and that "He has severe delays in multiple developmental domains, and his expressive language continues to be very limited." Dr. Nutt noted that "**We explained that [G.F.'s] prognosis is guided by functional language,**

**measured intelligence, and intensive – behavioral based services (e.g. DIR, ABA therapy) through school."** [Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 34) **(admitted).**

16. According to Defendant ESY Policy, students with disabilities who show substantial regression during the school year are refereed to students are referred to ESY. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 36) (admitted).**

17. G.F.'s IEP for the 2016-2017 School Year noted that G.F. "require[d] **direct**, special education instruction to improve his communication, motor, and social skill." G.F. "present[ed] with **significant delays** in his communication, fine and sensory motor, and socialization skills **which decreases his ability to socially interact and demonstrate his knowledge with a variety of peers and adults in an age appropriate setting**," and that G.F. continued to display severe delays in all areas of speech and language development, and that his pragmatic skills are severely delayed. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 38) (admitted).**

18. Again, ABA therapy, a Functional Behavior Assessment, and Behavior Improvement Plan were not recommended for G.F. for the 2016-2017 School Year, although his IEP identified various behaviors that were interfering with G.F.'s speech and language development. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 40) (admitted).**

   b) Dawn Hussein testified that physical restraints of a child should only be used if recommended by a Functional Behavior Analysis. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 40 (b)] (admitted).**

   c) An FBA was not prepared for G.F. during the 2016-2017 school year **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 40 (c)] (admitted).**

19. In spite of G.F.'s inconsistent progress with his speech and language goals during the 2015-2016, the CPSE reduced the frequency speech and language services recommended for G.F. for the Summer and the 2016-2017 School Year. G.F.'s speech and language services were reduced from 4 times per week during the 2015-2016 School Year to **3 times per week** (2x Weekly individually in the Therapy Room, and 1x Weekly individually in the Classroom) for the summer 2016 and the 2016-2017 School year. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 41] (admitted).**

20. Jason Nephew, Assistant Superintendent for Human Resources, testified that labor contracts do not prevent Defendants from hiring professionals outside their labor unions when union members are not qualified to perform the services needed to a disabled student. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 57] (admitted).**

21. DiFlorio also testified that when Defendants do contract out other professionals qualified to provide related services to students with disabilities when their staff is not qualified to provide the services. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 58] (admitted)**

22. Nephew admitted that it is Defendants' responsibility to provide appropriately certified or licensed professionals capable of providing remedial services set forth in students' IEPs, and, to the best of his knowledge, Defendants had no staff member certified or licensed to provide ABA therapy services to G.F. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 59] (admitted).**

23. The CPSE did not make any changes to G.F.'s speech and language services for the summer and 2017-2018 School Year, nor did it recommend ABA therapy services to G.F. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 62] (admitted).**

24. On April 6, 2017, Plaintiffs wrote to CPSE Chair Hussein to let her know that the programs recommended by Defendants could not accommodate G.F.'s needs. April F. renewed Plaintiffs' offer to pay for the 1:1 ABA therapist vetted by the district so that G.F. could receive ABA therapy in the school. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 64) (admitted).**

25. Plaintiffs requested Defendants for an independent neurodevelopmental evaluation of G.F., which was performed by Dr. Danielle Bronk in June 2017, when G.F. 4 years and 5 months old. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 66) (admitted).**

26. Dr. Bronk neurodevelopmental evaluation also recommended that G.F. receive intensive ABA therapy both at home and in school. Dr. Bronk's evaluation stated "[G.F] manifests particularly weak stimulus control, which is considered to be an area in need of intensive home and school-based intervention." **"...[A]n intensive focus on instructional control across home and school settings is of critical importance over the next academic year. A multimodal teaching approaching utilizing Applied Behavioral Analysis (ABA) methodology across settings is strongly recommended**." **[Dkt. No. 91-10 (Def's Resp. Stmt. Facts, ¶ 67) (admitted).**

27. During the period between August 2017 and June 2018, while G.F. was attending SPICE, G.F.'s hours of direct ABA therapy increased from 10 to 20 hours per week while he was attending SPICE because SPICE allowed G.F. to receive one-on-one direct ABA therapy in school paid by Plaintiffs. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 69) (admitted).**

28. Dr. Danielle Bronk was invited to attend the CPSE meeting on October 10, 2017 to discuss G.F.'s neurodevelopmental evaluation completed in June 2017. During that meeting, Dr.

Bronk stated that ABA therapy was the most appropriate treatment for G.F. and that ABA therapy should be provided to G.F. in the school. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 74] (admitted).**

29. Dr. Bronk explained that G.F. needed ABA therapy to be provided to him in school for the following reasons:

   a. G.F. obtained greater outcomes when ABA therapy services was provided to him;
   b. ABA therapy treatment would help G.F. self-regulate his behavior;
   c. ABA therapy would help G.F. decrease his self-directed behavior;
   d. ABA therapy would help G.F. concentrate on learning.

   **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 88] (admitted).**

30. CPSE Chair Hussein admitted Dr. Bronk told the CPSE that it was of critical importance for G.F. to receive intensive home and school-based ABA therapy in the course of his academic year in order to improve his communication and social development, and that ABA therapy was just as important to G.F. as speech and play therapies to enhance his communication. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 76] (admitted).**

31. On January 31, 2018, an Impartial Hearing Officer ("IHO") entered a Decision in favor of Plaintiffs finding that Defendants failed to provide necessary educational services to G.F. during the 2016-2017 and 2017-2018 School Years. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 85] (admitted).**

32. Dr. Danielle Bronk testified at the hearing and provided the following testimony:

   Q. Okay. And you had recommended ABA in your evaluation. Can you explain to us why you're recommending ABA?

   A. I recommended ABA because it is a behavioral treatment approach for individuals on the spectrum that can target some developmental areas where he is showing impairment.

Q. Okay. And do you think that G would make appropriate progress without ABA therapy?

A. **In my professional opinion, no. […], without a more intensive behavioral approach, I - - I don't see that - - that - - that meaningful change that we would want to see**.

Q. An you had indicated that's of critical importance over the next academic year for him to - - to receive ABA therapy. Can you explain to us why you're saying it's of critical importance for the next academic year?

A. Well, what we know for young children is the more intensive the service, the better they - - they potentially fare […].

**[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 86) (admitted).**

33. At the conclusion of the hearing, the IHO made the following findings of fact with respect to services Defendants provided to G.F. during the 2015-2016 School Year:

> In the 2015-2016 school year, the CPSE recognized that the Student is (a) "essentially nonverbal," (b) "tends to play by himself and unless very comfortable in a situation, usually with his mother present, will attempt to leave the area," (c) "requires a high level of adult support for any activity that requires turn taking" (Ex. R-16, p. R000073), and (d) does "not show a great deal of interest in other children his same age." (Ex. R-16, p. R000074). He engaged in repetitive behaviors (Ts. 88) and would be "wandering around the classroom" (Tr. 105, 164). School Psychologist Santa noted observing the "wandering around the classroom" (Tr. 295) continuing in the 2016-2017 school year. It is undebatable that the Student is not participating in the educational process in wandering about the classroom. This is one interfering behavior, which, if addressed through an FBA and a resulting BIP, could have been targeted to change to help the Student succeed."

**[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 90) (admitted).**

34. With respect to Defendants' failure include the provision of an FBA in G.F.'s IEP as part of his 2016-2017 school year, the IHO stated as follows:

> I conclude that the CPSE was required, when developing the IEP, to include a provision for an FBA to be conducted as part of his 2016-2017 IEP. The problematic behavior continued throughout 2016-2017 year. When the CPSE met on March 31, 2017, it was incumbent upon it to re-assess whether an FBA should be developed. Again, it failed to provide for one – in spite of

the fact that the Student's wandering, perseveration, and repetitive behaviors continued.

**[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 91] (admitted).**

35. The IHO noted that "[G.F] had not met his speech/language goal by the end of the 2015-2016 school year (Tr. 338-339) and goals were thereafter reduced to try to make ones that the Student could achieve in 2016-2017. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 92] (admitted).**

36. With respect to the 2016-2017 School Year, the IHO found that "The evidence strongly suggest that the Students did not make progress in his speech/language development in the 2016-2017 school year." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 93] (admitted).**

37. Per the IHO's order, G.F.'s was re-evaluated for speech and language, which showed that G.F. continued to present "significant delays in receptive/expressive language skills. Articulation skills were not formally assessed due to limited spontaneous language." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 103] (admitted).**

38. G.F.'s IEP dated March 20, 2018 noted that the FBA completed in February 2018 "determined that [G.F.] struggled with on task behaviors when an adult was not present resulting in self-directed behaviors." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 105] (admitted).**

39. Notwithstanding the FBA findings and the IHO's determination that BIP could have targeted G.F.'s behaviors "to help [him] succeed," the CPSE did not recommend a BIP for G.F. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 106] (admitted).**

40. G.F.'s IEP for the 2018-2019 School Year was developed to mirror the IHO's decision, which required 1 hour and 15 minutes of daily ABA therapy by a licensed

[BCBA] or LBA, under contract with the district; a one-on-one teaching assistant who was trained in the delivery of ABA therapy, and training for staff working directly with G.F. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 109) (admitted).**

41. G.F.'s IEP for the 2018-2019 school year stated that "[G.F.] will be provided 1 hour and 15 minutes of daily ABA therapy by a licensed [BCBA] or LBA, under contract by the district." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 110) (admitted).**

42. Amanda Wise was not permitted to accompany G.F. when he was pulled out of class for speech/language and occupational therapy sessions. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 120) (admitted).**

43. Although Linda Harvey received some ABA therapy training, such training did not qualify her to provide ABA therapy independently, without an RBT or LBA present. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 124) (admitted).**

44. On February 4, 2019, Foster attempted to administer a test of nonverbal intelligence fourth edition (TONI-4) to G.F. Once again, Foster had to discontinue her standardized administration of the test because G.F. "did not appear to understand the task directions." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 128) (admitted).**

45. Defendants' Speech Pathologist, Amy Stevens, explained that building skills in an environment that is distraction free is important "for isolating specific skills and providing repetitions and practice, and then the classroom provides the opportunities for carrying over of skills and tying of skill into the classroom." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 139) (admitted).**

46. According to Maria Scarfino, Amanda Wise and Linda Harvey (teaching assistant), would observe Saturno's one-on-one therapy with G.F., **so that they could implement the treatment into the classroom**." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 154] (admitted).**

47. Defendants' contracts with AAPSA show two different rates for 1:1 teaching aide and supervision and direct ABA therapy provided by an LBA. While the rate for the 1:1 teaching aide was set as $100 per hour, the rate for supervisor and direct ABA therapist was set at $150 per hour. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 155] (admitted).**

48. Valerie DiFlorio was the CSE Chair, Section 504 Compliance Officer, and Defendants' designated 30(b)(6) deponent with respect to Defendants' policies involving students with disabilities, including Defendants' "Extended School Year for Students with Disabilities," "Non-Discrimination," and "Students with Disabilities under Section 504. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶ 173] (admitted).**

## II.   DEFENDANTS ARE BOUND TO FACTS WHICH THEY FAILED TO DENY IN THEIR STATEMENT OF MATERIAL FACTS

"The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y. L.R. 56(b). "This requirement is not a mere formality; rather this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties."  *Nova v. Smith*, No. 9:19-cv-00072 (GTS/TWD), 2022 U.S. Dist. LEXIS 158346, at *25 (N.D.N.Y. Sep. 1, 2022) (internal quotation marks and citation omitted).  Indeed, where a party responds to the statement of material

facts "that a fact is either 'Undisputed' or 'Disputed,' but (in either case) then asserts additional facts (not directly responsive to the fact asserted) and/or makes legal arguments in those responses" and fails to "support[]a denial with a citation to the record where a factual dispute actually arises," "the Court will deem those facts admitted and disregard the additional facts and/or legal argument asserted by Plaintiff." *Carlisle v. UPS, Inc*., No. 7:15-CV-1376 (GTS/ATB), 2017 U.S. Dist. LEXIS 138909, at *6 (N.D.N.Y. Aug. 29, 2017); *see also CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 U.S. Dist. LEXIS 46438, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed'"); *Washington v. City of New York*, 05-CV-8884, 2009 U.S. Dist. LEXIS 47488, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'").  Failure to admit or deny each of Plaintiff's statement of material facts and, instead, provided "qualified answers" that are not sufficient to raise triable issues of fact, and are deemed admissions.  *See Carlisle v UPS, Inc.*, 2017 US Dist LEXIS 138909, *6 (N.D.N.Y. 2017).

Accordingly, the following facts for which Defendants failed to deny or to rebut with citation to the record, are admitted by Defendants and are judicial admissions to which they are bound:

49. The IHO found that Defendants violated G.F.'s rights during the 2016-2017 School Year as follows:

> Apart from the claim about that the District failed to implement the Student's 2016-2017 IEP in part and failed to conduct an updated speech/language evaluation, three inextricably intertwined substantive issues [to] determine whether the Student received FAPE in the 2016-2017 school year.  **They are (1) whether the Student required ABA therapy as part of his IEP, (2) whether**

**the Student required a full-day program, and (3) whether the Student required the services of a 1:1 aide throughout the day. I conclude that he required all three.**

**[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶94]**[1]

50. After discussing Dr. Bronk's testimony and recommendations, the IHO stated the following about G.F.'s need of ABA therapy in school:

> The rub is that the District did not have anyone trained in ABA therapy to even consider making it available to the Student as part of his services for the 2016-2017 or 2017-2018 school years (*see* Tr. 404 & Hussein testimony on 1-26-18). Thus, the CPSE could not and apparently did not consider making a recommendation for ABA therapy as part of the Student's IEP to target behaviors that limited his instructional control, that is his ability to comply with an instructional directive and attend to a particular stimulus. That the District could implement various teaching methods with the Student if a particular methodology was not specified on the IEP does not make the IEP appropriate nor the recommendation of ABA Therapy inappropriate. *See, M.H. v. New York City Dept. of Educ.*, 685 F.3d at 250 (2d Cir. 2012). **The issue is not whether the IEP limited teaching options if ABA therapy were provided, but whether this student needed ABA therapy intervention consistently provided at his young age. I conclude that he did and that the omission denied the Student FAPE when the CPSE recommended a continuation of his 2015-2016 special class integrated setting with related services for the 2016-2017 school year.**

**[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶95]**[2]

51. The IHO also found that Defendants failed to provide G.F. a full-time 1:1 Teaching Assistant during the 2016-2017 and 2017-2018 school years based on G.F.'s level of need and skills. The IHO wrote:

> The essential claim raised in Complaint #2 is that for the 2016-2017 and 2017-2018 school years, the Student needed a full time 1:1 teaching

---

[1] Defendants admitted the findings of the IHO. Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 94. Thus, said facts are admitted by the Defendants. *See Carlisle v UPS, Inc.*, 2017 US Dist LEXIS 138909, *6 (N.D.N.Y. 2017).

[2] Defendants admitted the findings of the IHO. Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 95. Thus, said facts are admitted by the Defendants.

assistant [hereafter "TA"] and that the District did not provide for one in the 2016-2017 (Ex. R-21; Tr. 96, 275-276) and 2017-2018 IEPs and then wrongfully removed limited 1:1 TA services from the Student's IEP for the 2017-2018 school year without the Parents' consent and in violation [of] the procedures for developing IEPs.

I addressed the procedural issue of removal of the 1:1 TA from the Student's 2017-2016 IEP earlier in this decision and will not repeat it here. I note, however, that the program focused on learning through play. Yet, as of March 31, 2017, the CPSE noted that he did not "interact with peers" (Ex. R-28, p. R000128) and, importantly, "the adult usually needs to initiate the activity and continue to engage [the Student] using physical and verbal prompts." (ex. R-28, p. R000128).

The Student clearly suffered from behaviors typically found in children with autism: (a) lack of eye contact (Tr. 363), (b) Self-stimulating or repetitive behaviors (tr. 154, 363, 386. Ex. R-35, p. R000159), (c) wandering around the classroom (tr. 105, 114-115, 154, 156, 295, 363), (d) lack of social engagement (Tr. 363, 291-292, Ex. R12, p. R000054, (e) difficulty sustaining joint attention (Tr. 294), (f) limited communication skills (Tr. 321), (g) perseverate over a particular toy (Tr. 88 & 90, 104, Ex. R-35, p. R000159). **I conclude that the Student needed a full-time 1:1 TA to receive a FAPE.**

**[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶97]**[3]

52. The IHO also found that Defendants failed to provide G.F. an educational program taught by a certified special education teacher for almost one-quarter of the 2016-2017 school year. The IHO concluded that "such a failure to implement an IEP is more than *de minimus*" because "the failure to provide a special education teacher for 47 school days is . . . at the heart of the New York Educational scheme for provision of appropriate educational services to students with disabilities." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶98]**[4]

---

[3] Defendants admitted the findings of the IHO. Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 97. Thus, said facts are admitted by the Defendants.

[4] Defendants admitted the findings of the IHO. Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 98. Thus, said facts are admitted by the Defendants.

53. The IHO also found that Defendants failed to design and implement G.F.'s IEP for the 2017-2018 School Year. Specifically, the IHO found stated as follows:

> [T]here are still no goals directed at interfering behaviors he exhibits that are associated with his autism diagnosis that prevent him from attending and accessing his educational program. That remains the area where the Parents' request for ABA Therapy could and, one could expect, would be addressed. **The same issues of unavailability of ABA Therapy services in the IEP and goals more specifically tailored to the Student's language and behavioral needs make the March 31, 2017-2018 proposed IEP inappropriate**. I find that the March 31, 2017 IEP failed to offer the Student a FAPE.
>
> **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶99][5]**

54. As a result, he IHO issued mandate ordering Defendants to do the following:

> **ORDERED,** that the CSE shall re-convene and modify the Students' IEP to include at least one 45-minute session of direct ABA Therapy services daily in school as part of the Student's educational program and provided by a licensed BACA or LBA employed by or under contract by the District; and, it is
>
> **ORDERED,** that the District shall provide the support of a 1:1 Teaching Assistant who is trained in delivery of ABA Therapy services so that the TA may help reinforce the daily ABA in-school services throughout the school day and facilitate attention and social interactions; and, it is
>
> **ORDERED,** that the District shall provide ABA Training to the staff working with the Student so that there is consistency in implementation of behavioral services for the Student throughout the school day and to facilitate coordination of those services at home; and, it is
>
> **ORDERED,** that the District provide, at public expense, additional Training in ABA techniques to the Parents to help consistently implement and generalize the Student's skills in school and his home setting; and it is

---

[5] Defendants admitted the findings of the IHO. Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 99. Thus, said facts are admitted by the Defendants.

**ORDERED,** that the District conduct an updated evaluation of the Student's speech and language skills within 30 calendar days and the Parents are directed to execute the necessary consent for the evaluation so that the CSE may review the updated speech/language evaluation report results within 30 calendar days thereafter and modify or otherwise update the Student's IEP speech/language goals and services.

**[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶100]**[6]

55. The IHO's mandate recognized that G.F.'s ABA treatment required at least 45 minutes **daily** of direct ABA therapy in school **provided by an LBA or BCBA**, as well as a teaching assistant who was **trained to deliver ABA therapy** to G.F. throughout the day in the classroom. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶101]**[7]

56. Defendants did not appeal the IHO's hearing decision. [Exhibit 2, (Answer), Dkt. No. 5, ¶37]. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶102]**

57. G.F.'s IEP dated March 20, 2018 required Defendants to provide the following services to G.F. in school for the remainder of the 2017-2018 school year as well as 2018 summer program:

> 1:1 Teaching Assistant trained in ABA Therapy for 5 hours/daily
> **Direct ABA therapy at school for 45 minutes/daily**
> Direct ABA therapy at home 6 hours/weekly (compensatory)
> Parent Training/Counseling for ABA at home 2 hours/monthly
> Additionally, SPICE to provide district and parents documentation to Staff training in ABA.

**[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶104]**[8]

---

[6] Defendants admitted the findings of the IHO. Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 100. Thus, said facts are admitted by the Defendants.

[7] Defendants admitted the findings of the IHO. Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 101. Thus, said facts are admitted by the Defendants.

[8] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 104. Thus, said facts are admitted by the Defendants.

58. A of March 2017, CPSE Chair Dawn Hussein knew that ABA therapy services provided in school included both a pull-out and in-class component. During the CPSE meeting on March 31, 2017, the following exchange happened between Angela Saturno and CPSE Chair, Dawn Hussein, about how ABA therapy services are provided in a school setting:

> **Ms. Hussein:** So it's not offering support directly to the child, it's offering support to the classroom?
>
> **Ms. Saturno:** It's both it's both. So we would demonstrate how like his best mode of the strategies for teaching is discrete trial instruction. So he's able to come to a table and sit there for a long, extended period of time and that's how we're teaching him and he's actually mastered 149 exemplars.
>
> So while some of this stuff does not generalize into a classroom or into the home setting unless we're there and we generalize them. So we plan for generalization. So in order to do that we need to physically be there.
>
> **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶142) (failure to admit or deny)**.

59. During the meeting on June 12, 2018, both Assistant Superintendent Dawn Wilczynski and CPSE Chair Hussein learned that ABA Therapist, Mary Ann Stockton, pulled G.F. out of the classroom to provide one-on-one direct ABA therapy to him while he was attending school at SPICE, an outside program recommended for G.F. by the District, as follows:

> **Ms. Stockton**: To be able to have kind of a private space to work with him. So then I've spent about 45 minutes doing that and then a half an hour for lunch and just kind of working on vocal approximations for him. He really the first day had no problem with it. Was like Oh OK. And from there it really was a good set up. It was a nice area. So I'll be mixing between the direct 1:1 at the table but then also generalizing in the natural environment and every opportunity I can push in [to the classroom], that's what I'll be doing.
>
> **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶144]**[9]

---

[9] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 144. Thus, said facts are admitted by the Defendants.

60. After the September 7th, 2018, Wheeler spoke with Angela Saturno and learned that G.F.'s

direct 1:1 ABA therapy was going to be a pull-out therapy. During her deposition, Wheeler

testified as follows:

> Q. Okay. And - - and I think you testified back in December that Angela
> was providing direct therapy to G.F. as a pull-out therapy.
>
> A. Yes.
> […]
> Q. So she was taking him out of the classroom to provide that therapy,
> right?
>
> A. Correct.
> **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶147]**[10]

61. Wheeler testified that "direct ABA therapy" meant that the ABA therapist "would take a

new skill that G.F. was learning and … use ABA methodologies, meaning a discrete trials

… over and over and over again until he was able to do it independently... They would take

one portion of a skill he was working on and do it with him **one-to-one directly.** And then

- - Amanda and Linda would continue to do that with him in the classroom." **[Dkt. No. 91-**

**10 (Def's Resp. Stmt Mat. Facts, ¶148]**[11]

62. Wheeler also knew that the one-on-one *direct ABA therapy* provided by Angela Saturno to

G.F. outside the classroom was different from ABA therapy provided by Amanda Wise in

the classroom. In her deposition, Wheeler explained the two different services as follows:

> Q. And what is your understanding of the direct ABA therapy services?
>
> A. Well, I haven't observed one. It's my understanding that they take a skill
> that's being worked on with the student and they do several practices. There
> is a name for it, it's escaping me at the moment. But they do several trials

---

[10] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in
paragraph 147.  Thus, said facts are admitted by the Defendants.

[11] Defendants' argument as to the relevancy of the testimony is not a proper denial of the facts asserted in
paragraph 148.  Thus, said facts are admitted by the Defendants.

with it. And so that that training is one part of his day, one service that he gets daily in school.

And then throughout the rest of the day Amanda worked with him in whatever they were doing, Linda would work, they literally would be on either side of him working with him. So she was providing both additional practice with the skills as well as modeling for Linda and/or the Teacher what it looked like to do that with ABA therapy.

**[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶149]**[12]

63. Plaintiffs told Wheeler that one-on-one direct ABA therapy performed by Amanda Wise with G.F. at home was different from the services she was providing G.F. in the classroom. During a meeting on September 18, 2018, Robert F. stated the following:

ROBERT F.: Now, on that note, like when Amanda comes to the house to do ABA therapy because she does. It looks dramatically different than how she is in the classroom. Because it's direct ABA therapy, repetitious, going over this certain drill, DDT, manding, whatever it is. And that doesn't look nothing like instruction, doesn't look nothing like teaching. It doesn't look anything like necessarily in a school environment.

**[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶150]**[13]

64. Maria Scarfino, G.F.'s special education teacher, candidly admitted Defendants' reluctance to allow G.F. to be pulled out of class to receive *direct ABA therapy*. During her deposition, she stated as follows:

Q. And what do you mean by pull out services, what is that?
A. So initially we had expressed interest in having ABA within the full confines of the classroom. And there were times that Angela, Ms. Saturno, has asked to take him out of the classroom to provide more direct service for him. And she would take him to my office with Mr. Wise and Ms. Harvey.

---

[12] Defendants' argument as to the relevancy of the testimony is not a proper denial of the facts asserted in paragraph 149.  Thus, said facts are admitted by the Defendants.

[13] Defendants' argument as to the relevancy of the testimony is not a proper denial of the facts asserted in paragraph 150.  Thus, said facts are admitted by the Defendants.

**[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶153]**[14]

65. The CSE assigned G.F. to attend ESY at BOCES during the Summer of 2019 over Plaintiffs' objections that BOCES could not provide the related services needed for G.F. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶163]**[15]

66. DiFlorio testified that a student who does not receive recommended services during the summer program will regress in his education. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶164]**[16]

67. It was Defendants' responsibility to ensure that the services necessary to a student during the ESY were provided. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶165]**[17]

68. Nonetheless, the CSE did not recommend ABA therapy to G.F. but only speech and OT services while G.F. was attending ESY at BOCES in the summer 2019. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶166]**[18]

69. The CSE recommended G.F. to attend ESY at BOCES even though the CSE could not ensure that BOCES would have staff trained to use G.F.'s augmentative communication

---

[14] Defendants' argument as to the relevancy of the testimony is not a proper denial of the facts asserted in paragraph 153. Thus, said facts are admitted by the Defendants.

[15] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 163. Thus, said facts are admitted by the Defendants.

[16] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 164. Thus, said facts are admitted by the Defendants.

[17] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 165. Thus, said facts are admitted by the Defendants.

[18] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 166. Thus, said facts are admitted by the Defendants.

device recommended in his IEP as necessary for his education. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶167]**[19]

70. DiFlorio testified that she made no efforts to ensure that BOCES was able to implement the services required to G.F. pursuant to the IHO's decision. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶168]**[20]

71. Defendants' "Students with Disabilities under Section 504" policy states as follows:

> "Qualifying students who need accommodations to participate in the District's educational programs on an equal basis with their non-disabled peers shall be evaluated by a Section 504 Team convened by the District and provided a free appropriate public education through a Section 504 Accommodation Plan ("Section 504 Plan.") that outlines the accommodations the student will receive."
>
> [. . .]
>
> The District Coordinator, in collaboration with each school principal, shall appoint School-Based Section 504 Coordinators ("School Coordinators") to oversee the implementation of this Policy at the school level. School Coordinators may be Committee on Special Education chairs, School Psychologists, Support Teachers, Counselors, or any other qualified individuals. The School Coordinators shall ensure that parents receive appropriate Section 504-related notifications. Each Section 504 Team shall consist of at least two persons other than the student's parent, including:
>
> a. at least one person familiar with the student's abilities;
>
> b. at least one person able to interpret any reports or evaluations that have been provided either by the parent or the school in connection with the request; and
>
> c. at least one person knowledgeable of the accommodations available.
>
> **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶170]**[21]

---

[19] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 167. Thus, said facts are admitted by the Defendants.

[20] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 168. Thus, said facts are admitted by the Defendants.

[21] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 170. Thus, said facts are admitted by the Defendants.

72. Defendants' "Section 504" policy further states that "Although a 504 Accommodation Plan is not a substitute for an IEP, students who are evaluated pursuant to the IDEA, may be referred to the student's School Coordinator, who should convene a Section 504 Team to determine whether the student qualifies as a disabled student within the meaning of Section 504." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶171]**[22]

73. "Reasonable Accommodation" is defined under Defendants' policy to include, among other things, "(3) Modifications […] to regular programs or the provision of different programs [when] necessary" and "(4)(d) using behavioral management techniques." **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶172]**[23]

74. DiFlorio testified that under Defendants' Section 504 policy, a Section 504 team should convene upon learning of a student's diagnosis to determine how the disability is impacting the student's education and what accommodations the student would need. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶174]**[24]

75. 175. A Section 504 Plan was never created for G.F. in spite of his documented disability. **[Dkt. No. 91-10 (Def's Resp. Stmt Mat. Facts, ¶175]**[25]

---

[22] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 171.  Thus, said facts are admitted by the Defendants.

[23] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 172.  Thus, said facts are admitted by the Defendants.

[24] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 174.  Thus, said facts are admitted by the Defendants.

[25] Defendants' denial as to materiality of the findings are not a proper denial of the facts asserted in paragraph 175.  Thus, said facts are admitted by the Defendants.

III.   **THE IMPARTIAL HEARING DECISION SHOULD BE ADMITTED INTO EVIDENCE BECAUSE IT IS AN AUTHENTIC DOCUMENT WHICH THE COURT MAY TAKE JUDICIAL NOTICE OF**

In addition to the fact the Defendants have admitted much of the IHO's findings in their response to Plaintiffs' Statement of Material Facts as addressed in Point I, *supra*, the Court may take judicial notice of the Impartial Hearing Officer Decision dated January 31, 2018.  Courts "may take judicial notice of the records of state administrative procedures." *Thomas v. Westchester Cnty. Health Care Corp*., 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002) (internal quotation marks and citations omitted); *see also Combier-Kapel v. Biegelson*, 242 F. App'x 714, 715 (2d Cir. 2007) (summary order) (approving of district court's consideration of IHO decision and documents in administrative record in deciding IDEA claims, as documents were subject to judicial notice and integral to complaint); *Kavowras v. N.Y. Times Co*., 328 F.3d 50, 57 (2d Cir. 2003) ("Judicial notice may be taken of public filings[.]").  The Court can "take judicial notice of facts relevant to the constitutional question." *Chau v. SEC*, 665 F. App'x 67, 72 (2d Cir. 2016).  In this regard, "the court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions." *Agee v. Cuomo*, No. 9:19-CV-57 (BKS/ATB), 2020 U.S. Dist. LEXIS 50405, at *4-5 (N.D.N.Y. Mar. 23, 2020).

As addressed fully in Point VI, infra, these records are also self-authenticating.  Accordingly, here, the Court should take judicial notice of the administrative IHO hearing and decision that resulted therefrom and admit same into evidence.  Furthermore, the IHO's decision is highly probative of Defendants' acts and omissions during his preschool years, which has already been determined by this Court to constitute deliberate indifference to G.F.'s rights[26], and after the IHO's decision was issued.

---

[26] *Robert F. v N. Syracuse Cent. Sch. Dist.*, 2021 US Dist LEXIS 151648, at *21 (N.D.N.Y. Aug. 12, 2021)

IV.     **STATEMENTS OF DEFENDANTS' EMPLOYEES RELATED TO MATTERS WITHIN THE SCOPE OF THEIR AGENCY ARE ADMISSIBLE AS STATEMENTS OF A PARTY OPPONENT UNDER FRE 801(d)(2)(D)**

"Under the party-opponent exemption, a statement is not hearsay if it was 'made by the party's agent or employee within the scope of that relationship and while it existed.'" *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 79 (2d Cir. 2016) (quoting FRE 801(d)(2)(D)).   Where it is uncontested that the individual making the statement is employed by the opposing party at the time the statement is made, applicability of the party-opponent exception depends upon whether the statement "relates to a matter within the scope of the agency." *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996).   In this regard, decision-making authority is not the test, but rather "the declarant 'need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement' for the statement 'to be deemed within the scope of [the declarant's] agency.'" *Walsh*, 828 F.3d at 79 (quoting *Rioux*, 97 F.3d at 661)).   Indeed, the statement does not even need to be against the party's interest when made.  *See* Fed. R. Evid. 801 advisory committee's note (2011 Amendment).

For example, where a defendant school district assigned a "buddy teacher" to assist the plaintiff, statements by the "buddy teacher" that training ceased because of the plaintiff's ability were not inadmissible hearsay.  *See Ayazi v. N.Y.C. Bd. of Educ.*, No. 98-CV-7461 (NGG)(CLP), 2004 U.S. Dist. LEXIS 34452, at *21 n.5 (E.D.N.Y. Sep. 13, 2004).   Similarly, where statements were made by a committee member and another employee whose "input was elicited" on the matter, those statements were properly before the Court under the party-opponent exemption. *McPartlan-Hurson v. Westchester Cmty. Coll.*, No. 13-CV-2467 (NSR), 2018 U.S. Dist. LEXIS 104169, at *10 n.7 (S.D.N.Y. June 21, 2018).

Here, the following individuals made statements while employed by Defendants as either advisor or participant in the decision-making process as it relates to the services which should have been provided to G.F:

1. Phillip Cleary, Special Education Teacher:
   a. P-6. Phillip Cleary Email dated Aug. 31, 2015 – Subject: Almost school time

2. Jason Nephew, Assistant Superintendent for Human Resources:
   a. Deposition Testimony [Fed. R. Civ. Proc. 32 (a) (3) Deposition of Party, Agent, or Designee]

3. Amy Stevens, Speech Pathologist
   a. Deposition Testimony [Fed. R. Civ. Proc. 32 (a) (3)]

4. Maria Scarfino, Special Education Teacher;
   a. Deposition Testimony [Fed. R. Civ. Proc. 32 (a) (3)]

5. Amanda B. Foster, School Psychologist.
   a. Deposition Testimony [Fed. R. Civ. Proc. 32 (a) (3)]
   b. P-30. Confidential Reports by Amanda Foster dated 10/31/2018 and 2/14/2019 (Test of Nonverbal Intelligence [TONI-4]).

6. Annette Speech, Superintendent of Schools:
   a. Deposition Testimony [Fed. R. Civ. Proc. 32 (a) (3) and (4) Unavailable Witness]
   b. P-14. Email dated April 6, 2017 Re: Response to CPSE meeting
   c. P-53. Email dated June 12, 2019 Re: Meeting with the Flemings
   d. P-65. Email dated April 7, 2017 Re: Response to CPSE meeting

7. Wendy E. Tracy, Speech Pathologist:
   a. P-8. Speech and Language Report (2015-2016)

8. Dawn Wilczynski, Assistant Superintendent:
   a. P-78. Certified Transcript of CPSE Meeting dated June 12, 2018

Accordingly, any statements made by the above individuals that relate to the services which should have been provided to G.F. are admissible and not hearsay.

**V.    POLICIES OF DEFENDANTS WHICH WERE AUTHENTICATED BY FED. R. CIV. P. 30(B)(6) DEPONENTS ARE AUTHENTIC AND NOT INADMISSIBLE HEARSAY**

Defendants have agreed to stipulate as to the foundation and authenticity of its own records produced in discovery.

The sworn testimony of Defendant's 30(b)(6) deponents is binding on the Defendant.  *See Marriott v. County of Montgomery*, 426 F. Supp. 2d 1, 8, fn. 8 (NDNY 12, 2006) (rejecting defendants' attempt to discredit the testimony of their own sworn 30(b)(6) deponent); *see also Sabre v. First Dominion Capital, LLC*, 2001 U.S. Dist. LEXIS 20637, 2001 WL 1590544, at *1 (S.D.N.Y. 2001) ("A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity") (citations and quotations omitted).  Defendants designed the following party, agents, or designees as 30(b)(6) deponents to authenticate defendants' policies:

- Dawn Hussein:

    1. P-59: Policy #4321: Special Education Services for Children with Disabilities Ages 3-4

- Valerie DiFlorio:

    1. P-60: Policy #5400: Independent Educational Evaluation

    2. P-61: Policy #4321.2: Extended School Year for Students with Disabilities;

    3. P-62: Policy #4321.6: Students with Disabilities Participation in District Programs;

    4. P-63: Policy #5020: Non-Discrimination

    5. P-64: Policy #4320: Students with Disabilities under Section 504.

Accordingly, these documents are already authenticated by the testimony of Defendants and, because they are not inadmissible hearsay for the same reasons as set forth in Point III, *supra*, should be admitted into evidence.

## VI. ALL RECORDS PRODUCED BY DEFENDANTS AS PART OF G.F.'S SCHOOL RECORDS ARE REASONABLY AUTHENTIC AND NOT INADMISSIBLE HEARSAY

During discovery, Defendants produced various records that were part of G.F.'s school records. These records are reasonably authentic and, for the same reasons addressed in Point III, *supra*, are not inadmissible hearsay. The "proof of authentication may be direct or circumstantial." *United States v. Al-Moayad*, 545 F.3d 139, 172 (2d Cir. 2008). Rule 901 of the Federal Rules of Evidence governs the authentication of evidence and provides, in pertinent part, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "This requirement is satisfied if sufficient proof has been introduced so that a reasonable [factfinder] could find in favor of authenticity or identification." *United States. v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014) (internal quotation marks and citation omitted). FRE 901 provides various examples of authentication techniques within different contexts, however the advisory committee's note states these are, "not intended as an exclusive enumeration of allowable methods but are meant to guide and suggest, leaving room for growth and development in this area of the law." *Vayner*, 769 F.3d at 129 (quoting Fed.R.Evid. 901(b) advisory committee's note to Subdivision (b)).

The burden imposed by FRE 901 is a low one and "does not erect a particularly high hurdle." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001). Authentication is satisfied "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity

or identification." *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 2001) (internal quotation marks omitted).  "[T]he standard for authentication, and hence admissibility, is one of reasonable likelihood." *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (internal quotation marks omitted). "If in the court's judgment it seems reasonably probable that the evidence is what it purports to be, the command of Rule 901(a) is satisfied, and the evidence's persuasive force is left to the jury." *Dhinsa*, 243 F. 3d at 658 (citation and quotation marks omitted). Under Rule 901(b)(4), the requirements are met if the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," indicate that the document is what it is purported to be.  Discovery, in many regards, provides "an implicit guarantee of authenticity," particularly where the Defendant produced the records via a custodian of same. *U.S. Info. Sys. v. IBEW Local Union No. 3*, 2006 U.S. Dist. LEXIS 52870, at *16 (S.D.N.Y. Aug. 1, 2006); *see also LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, No. 12-CV-7311 (JPO), 2017 U.S. Dist. LEXIS 48020, at *28 (S.D.N.Y. Mar. 30, 2017) ("find]ing] that the exhibits are sufficiently authenticated through their production during discovery").

Defendants have agreed to stipulate as to the foundation and authenticity of its own records produced in discovery.  Defendants produced, through individuals with a custodial capacity of those records, the following which are authentic pursuant to FRE 901 and not inadmissible hearsay under FRE 801(d)(2)(D), discussed *supra*:

**[P-1]**   Dr. Corey Grassl Confidential Psychological Report dated Dec. 3, 2014 (Saturno Ex. 1)

**[P-2]**   Early Education Program– Preschool Student Social History (Hussein Ex. 2)

**[P-3]**   Early Education Program – Confidential Evaluation Report – April 2015 (Hussein Ex. 4)

**[P-4]**   CPSE Minutes of Meeting – April, 27, 2015 (Hussein Ex. 7)

**[P-5]**   IEP dated April 27, 2015 (Hussein Ex. 8)

**[P-6]**  Phillip Cleary Email dated Aug. 31, 2015 – Subject: Almost school time (Hussein Ex. 6)

**[P-7]**  Progress Reports for Goals and Objectives dated 6/16/2016 and Annual Review Summary Report (3-Year-Old) – March 2016 (Hussein Ex. 10)

**[P-8]**  Wendy E. Tracy Speech/Language Report – 2015-2016 (NSC5123-5124).

**[P-9]**  IEP dated May 11, 2016 (Hussein Ex. 11)

**[P-10]** Certified Transcript of June 15, 2018 CPSE Meeting (PLF002010-PLF002074)

**[P-11]** Progress Reports for Goals and Objectives dated 6/21/2017 Annual Review Summary Report (4-Year-Old) – March 2017.

**[P-12]** IEP dated March 31, 2017 (Hussein Ex. 15A)

**[P-14]** Annette Speach/Dawn Wilczynski/Dawn Hussein Emails dated April 6, 2017 – Subject: Response to CPSE meeting (NSC00000445; 448; 452)

**[P-16]** Neuro-Developmental Evaluation by Dr. Danielle M. Bronk dated June 2017 (Hussein 17)

**[P-17]** Danielle Bronk Email dated 9/8/17 - Subject CPSE invite for Gavin Fleming (Hussein 19)

**[P-18]** IEP dated October 10, 2017 (Exhibit #37 – Dkt. No. 84-89)

**[P-19]** IEP dated November 1, 2017 (Hussein 15B)

**[P-20]** Eric Young Email to Dawn Hussein dated 11/20/2017 – Subject: Happy Monday (NSC00006988)

**[P-21]** Eric Young Email to Dawn Hussein dated 11/21/2017 – Subject: Part 2 (Dkt. No. 84-38)

**[P-22]** IEP dated December 4, 2017 (Exhibit #39 – Dkt. No. 84-41); (Hussein 16)

**[P-24]** IEP dated March 20, 2018 (Hussein 21)

**[P-30]** Confidential Reports by Amanda Foster dated 10/31/2018 and 2/14/2019 (Test of Nonverbal Intelligence [TONI-4]).

**[P-42]** IEP dated June 15, 2018 (DiFlorio Ex. 3).

**[P-44]** Email from Dr. Megan Brown to Valerie DiFlorio & Kathy Wheeler dated August 20, 2018 – Subject Contract Form Received (Wheeler Ex. 12).

**[P-45]** Email from Dr. Megan Brown to Valerie DiFlorio & Kathy Wheeler dated August 16 through 21, 2018 – Subject Contract Form Received (Wheeler Ex. 13).

**[P-55]** Academic Record Review – Kid Success, Inc., dated 1/17/2018 (PLF000855-000879) (Wheeler Ex. 1)

**[P-77]** Disclaimer (Wheeler Ex. 16)

## VII.  OFFICIAL RECORDS, CERTIFIED TRANSCRIBED RECORDS AND RECORDINGS OF CPSE AND CSE MEETINGS, AND THE TESTIMONY RECEIVED AT IMPARTIAL HEARINGS ARE SELF-AUTHENTICATED

FRE 902(4) provides that "[a] copy of an official record—or a copy of a document that was recorded or filed in a public office as authorized by law—if the copy is certified as correct by: (A) the custodian or another person authorized to make the certification" to be self-authenticating. These documents "are self-authenticating as official publications." *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, No. 12-CV-7311 (JPO), 2017 U.S. Dist. LEXIS 48020, at *28 (S.D.N.Y. Mar. 30, 2017).

Accordingly, the following documents are self-authenticating:

[P-25]  New York State Education Department Decision dated May 16, 2018 (Dkt. No. 23-1, pp. 12-21);

[P-26]  New York State Education Department Decision dated Nov. 17, 2019 (Dkt. No. 85-52);

[P-80]  New York State Education Department Decision dated May 17, 2019 (Dkt. No. 23-1, pp. 23-32).

Certified transcription of statements made during CPSE and CSE meetings and testimony at the impartial hearing are self-authenticated certified records under FRE 902(8).  An acknowledged document is one supported by a formal declaration to an authorized official from the person executing the document that it bears their signature.  Federal Practice and Procedure at§ 7142. The declaration is an "acknowledgment" under the rule, the document must carry a

"certificate of acknowledgment," which is a certificate of a notary or other authorized officer, stating that the person signing the underlying document appeared before the officer on a certain date and voluntarily signed the document. *Id.* For example, a trial transcript is admissible as certified copy of public record and, as such, is presumed to be correct statement of testimony. *See United States v. Lumumba*, 794 F.2d 806 (2d Cir. 1986), *cert. denied*, 479 U.S. 855 (1986).

Moreover, the recordings of CPSE and CSE meetings can be authenticated by Robert and April Fleming under FRE 901(5). "An opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker." FRE 901(5). "Lay opinion on this issue is permissible so long as the witness testifying has this requisite familiarity with the speaker." *United States v. Thomas*, 586 F.2d 123, 133 (9th Cir. 1978); *see also* Advisory Committee Notes, Fed.R.Evid. 901, 28 U.S.C.A. at 716 (example 5). "Once a prima facie case of authorship is made out by the proponent of the evidence, the testimony is admissible; and the reliability of the identification is for the jury." *United States v. Albergo*, 539 F.2d 860 (2d Cir. 1976), *cert. denied*, 429 U.S. 1000 (1976). Similarly, the certified transcripts of these audio recordings may be authenticated by Robert and April Fleming. *See United States v. Puentes*, 50 F.3d 1567, 1576 (11th Cir. 1995) (holding that testimony establishing familiarity with the defendant's voice was sufficient to authenticate the contents of transcription).

Accordingly, the following recordings and certified transcripts are properly authenticated or will be through the testimony of Robert and April Fleming:

    **[P-13]** Recording and Certified Transcript of March 31, 2017 CPSE Meeting (PLF001876-PLF001947)

    **[P-47]** Recording and Certified Transcript of September 7, 2018 CSE Meeting (PLF002491-PLF002566)

[P-57] Recording and Certified Transcript of May 30, 2018 CPSE Meeting (PLF002289-PLF002339)

[P-78] Certified Transcript of June 12, 2018, 2018 CPSE Meeting (PLF001967-PLF002009)

[P-79] Transcript of Danielle Bronk, Ph.D. Testimony at Impartial Hearing – Jan 2, 2018 (NSC2517-NSC2578).

## VIII. EVIDENCE OF DEFENDANTS' NON-COMPLIANCE SHOWING DELIBERATE INDIFFERENCE AFTER THE FILING OF PLAINTIFFS' COMPLAINT IS ADMISSIBLE AS BACKGROUND EVIDENCE REGARDING MOTIVE

It is expected that Defendants will argue, once again, that Plaintiffs' evidence shall be limited to the period when G.F. was a preschooler with defendants' schools.  This Court has already rejected Defendants' argument finding the IHO's decision did not expire at the end of the 2018 school year (Preschool).  *Robert F. v N. Syracuse Cent. Sch. Dist.*, 2019 US Dist LEXIS 241300, at *10-11 (N.D.N.Y. July 24, 2019) ("This argument is unsupported by the case law, the IHO Decision, and basics notions of efficiency.").  The IHO himself explicitly recognized that the services Plaintiff needed were expected to continue beyond his preschool years when the IHO ordered the Defendants to "re-convene and modify the Student's IEP to include at least one 45-minute session of direct ABA Therapy services daily in school as part of the Student's educational program." [Dkt. No. 84-34, p. 34].  Thus, Plaintiff should be permitted to present to the jury evidence and testimony about Defendants' acts or omissions related to the services necessary for Plaintiff during his kindergarten and beyond, in particular the services ordered by the IHO.

"The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' *Liona Corp. v. PCH Assocs. (In Re PCH Assocs.),* 949 F.2d 585, 592 (2d Cir. 1991) (quoting *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816, 100 L. Ed. 2d 811, 108

S. Ct. 2166 (1988)); *see also* 1B James W. Moore, Jo D. Lucas & Thomas S. Currier, *Moore's Federal Practice* 0.404[1], at 117 (1991) ("Under the doctrine of law of the case, a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation.")." *Dilaura v Power Auth. of NY*, 982 F2d 73, 76 (2d Cir 1992)). The doctrine does allow the court to reconsider its own decision prior to final judgment where there is "*an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice*." *Id*. (emphasis added).

Here, there is no "intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice" that would justify this Court to reconsider its prior decision on the merits of Defendants' argument that Plaintiffs' claim and evidence is limited to his preschool years. *Dilaura v Power Auth. of NY*, 982 F2d 73, 76 (2d Cir 1992); *see also Spears v Liberty Life Assur. Co. of Boston*, 2018 US Dist LEXIS 87676, at *25 (D Conn 2018) (applying the law of the case where plaintiff failed to raise new facts to compel the court not to apply the law of the case). Although it is true that the law of the case should be applied with restraint to preliminary injunction decisions, *Dilaura*, 982 F2d at 77, here, the application of the doctrine is warranted because, as Judge Kahn stated, Defendants' "argument is unsupported by the case law, the IHO Decision, and basic notions of efficiency." *Robert F. v N. Syracuse Cent. Sch. Dist.*, 2019 US Dist LEXIS 241300, at *10-11 (N.D.N.Y. July 24, 2019).

Furthermore, the conduct of the defendants after Plaintiff's preschool years is highly probative of Defendants' deliberate indifference to Plaintiff's rights, even after they had been ordered to provide certain services necessary for Plaintiff to have a meaningful access to his education.

The Supreme Court has recognized the need for "evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 182-83 (1997).

> Evidence thus has force beyond any linear scheme of reasoning and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences . . necessary to reach an honest verdict. This persuasive power of the concrete and particular is often essential to the capacity of jurors to satisfy the obligations that the law places on them.

*Id*. at 187.

Acts that occurred outside the scope of the complaint are thus still relevant for the jury to hear with regard to background, particularly where it involves the deliberate indifference at issue. In *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 52 L. Ed. 2d 571, 97 S. Ct. 1885 (1977) the Court held that although the plaintiff failed to file a charge of discrimination as it related to certain acts within the charge filing period, evidence thereof "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Air Lines*, 431 U.S. at 558. "The emphasis, however, should not be placed on mere continuity but on whether any present violation existed." *AMTRAK v. Morgan*, 536 U.S. 101, 112, 122 S. Ct. 2061, 2072 (2002) (internal quotation marks and citation omitted). Thus, evidence of a defendant's continued non-compliance "can still be considered in deciding whether there was a policy of deliberate indifference." *Golodner v. City of New London, CT*, No. 3:14-CV-173 (MPS), 2016 U.S. Dist. LEXIS 31476, at *18 (D. Conn. Mar. 11, 2016).

Here, Defendants continued to fail to provide the services required of G.F. even after the complaint was filed and evidence thereof is relevant to provide background context for the jury with regard to Defendants' deliberate indifference.

IX.     **COURT SHOULD INSTRUCT THE JURY ON THE "LOST CHANCE DOCTRINE" –** *1A NY PJI 2:70.*

Courts in New York recognize the "Lost Chance doctrine" in medical malpractice cases where a defendant's acts or omissions was a proximate cause of an injury or when such acts or omissions diminished the patient's chance of a better outcome. *See Wild v. Catholic Health Sys*, 21 NY3d 95 (2013) ("The negligence of the defendants may be considered a cause of the injuries to [decedent] if you find the defendant[s'] action or omissions deprived [decedent] of a substantial possibility of avoiding the consequences of … having a permanent feeding tube.").

The Lost Change doctrine that applies to medical malpractice cases applies to the present case because plaintiffs allege that the school district deviated from the standard of care and denied medical services (ABA Therapy) necessary for G.F. to have a meaningful access to an education. The evidence will show that ABA therapy is a medical treatment recommended for children diagnosed with autism spectrum disorder.  Defendants were aware that ABA therapy is a clinical treatment and not an educational methodology.

Plaintiffs allege that defendants negligently and deliberately denied clinically recommended services that were necessary for Plaintiff G.F.'s access to education.  Like in medical malpractice cases, G.F.'s chance for a better outcome is directly related to Defendants' acts or omissions.  The issue of causation involves the effect of a failure to follow a certain course of treatment.

Plaintiffs' experts are expected to testify that providing intensive ABA therapy to G.F. during a critical period of his brain development is the standard of care.  It is not necessary that Plaintiffs' expert quantify the extent to which Defendants' denial of the recommended ABA treatment to G.F. diminished his chanced of a better outcome.  *Flaherty v Fromberg*, 46 AD3d 743, 745 (2007); *accord Neyman v Doshi Diagnostic Imaging Servcs., P.C.*, 153 AD3d 538 (2017);

*Goldberg v Horowitz*, 73 AD3d 691, 694 (2010).  "A plaintiff's evidence of proximate cause may be found legal sufficient even if his or her expert is unable to quantify the extent to which the defendant's act or omission decreased the plaintiff's chance of a better outcome or increased the injury, as long as the evidence is presented from which the jury may infer that the defendant's conduct diminished the plaintiff's chance of a better outcome or increases [the] injury." *D.Y. v. Catskill Regional Med. Ctr.*, 156 AD3d 1003 (3d Dept 2017); *see also Semel Guzman*, 84 AD3d at 1055-1056 (2d Dept 2011), quoting *Goldberg v Horowitz*, 73 AD3d 691, 694 (2010); *Gagliardo v Jamaica Hospital*, 288 AD2d 179 (2d Dept 2001).

As a result, the Court should instruct the Jury as follows:

A negligent act or omission may be a proximate cause of injury if you determine that it more likely than not deprived the Plaintiff of a substantial chance or possibility of a better outcome.  In order to be substantial, the loss does not have to be more likely than not, it does have to be greater than 50% nor does it have to quantified to reflect the percentage of loss so long as it is not slight and the evidence reasonably shows that there was a diminished chance or possibility of a better outcome.

DATED: May 9, 2023
      Albany, New York

Respectfully submitted,
**COOPER ERVING & SAVAGE LLP**

/s/ Carlo A. C. de Oliveira
Carlo A. C. de Oliveira, Esq.
Bar Roll No.: 516271
Attorneys for Plaintiffs
39 North Pearl Street,
Fourth Floor
Albany, New York 12207-2797
(518) 449-3900